## JOHNSON et al. v. DALLAS DOWNTOWN DEVELOPMENT CO.

### No. 10432.

Circuit Court of Appeals, Fifth Circuit.

Dec. 10, 1942.

Chas. S. McCombs and Wm. Andress, Jr., both of Dallas, Tex., for appellants.

William Lipscomb, of Dallas, Tex., for appellee.

Irving J. Levy, Acting Sol., U. S. Dept. of Labor, and Mortimer B. Wolf, Asst. Sol., U. S. Dept. of Labor, both of Washington, D. C., and Llewellyn B. Duke, Regional Atty., U. S. Dept. of Labor, of Dallas, Tex., amici curiae.

Before SIBLEY and HUTCHESON, Circuit Judges, and KENNERLY, District Judge.

288

KENNERLY, District Judge.

Appellee is a Texas Corporation which owns and operates an office building in Dallas, Texas. Offices in the building were rented or leased by Appellee to numerous tenants. The thirteen Appellants are negro employees of Appellee, six being elevator operators and seven being porters or janitors. All are employed in Appellee's building. Alleging that since two years prior to the filing of this suit, they have been required by Appellee to work more than the maximum hours permitted, and have been paid less than the minimum wages fixed, by the Fair Labor Standards Act of 1938, Sections 201 to 219, Title 29 U.S.C.A., 52 Stat. 1060, Appellants brought this suit in the lower Court against Appellee under Section 16(b) of the Act, for wages, damages, and attorney's fees. The trial resulted in Judgment for Appellee, and Appellants are here, complaining of such Judgment.

Appellants say that under the facts, they are entitled to recover under both Section 6(a) and Section 7(a) of the Act, which fix a minimum wage and maximum hours of labor for employees "engaged in commerce" or "in the production of goods for commerce".[1]

The facts are that six of the Appellants operated the elevators which carried the tenants, their employees, visitors, customers, etc. up and down to the various floors of the building, and seven Appellants cleaned and kept fit for use and occupancy the halls, lobbies, toilets, etc. and the offices of the tenants.[2]

Appellee's only business was owning and operating the building, Appellants were employed only in the building, and neither Appellee nor Appellants were engaged either in or about the building or elsewhere in the production of goods of any kind or character. Many of Appellee's tenants were engaged in intrastate commerce, but a substantial number of them were engaged, wholly or in part, in some type of interstate business or "in commerce" within the meaning of the Act. None of such tenants nor other persons were engaged in the production of goods of any kind or

[1] The pertinent portion of Section 6(a) is as follows: "Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates —" etc.

The pertinent portion of Section 7(a) is as follows: "No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—" etc.

[2] A very clear statement of the work performed by Appellants is to be found in Appellants' Brief, which we quote: "It was shown that six of the plaintiffs were elevator operators, whose duties were to carry passengers up and down the building, carrying everybody that came in, tenants and all their customers indiscriminately, with no distinction between the nature of the business, and they did not ever know about the load whether they were engaged in interstate commerce or people engaged in intrastate commerce and the passengers were so intermingled that they could not distinguish between them. Tom Johnson was the general head porter, doing some work himself and being over the others, doing janitor work and sometimes cleaning up offices and he cleaned the lobby every morning. He cleaned offices indiscriminately regardless of the nature of the business of the tenant who occupied it. The lobbies and halls of the building are used by all of the tenants and no distinction is made between whether they are interstate commerce or intrastate commerce tenants. Six of the other plaintiffs were also janitors or porters or utility men whose duty it was to clean up offices, empty cuspidors, clean waste baskets, keep the halls clean, paint the walls and floors on the inside of the building and keep offices indiscriminately regardless of who occupied them, doing plaster work and doing all of the other jobs that were necessary. All of them worked under the direction of Harry Meador, the manager of the building, and did whatever he told them, and their services were necessary in order to keep the building open and running. The building is a twelve-story modern building, catering only to tenants who want a building which furnishes heat, lights, water, janitor service and elevator service. The work which the plaintiffs do is usual and customary work done in buildings and necessary to keep them clean in order to keep tenants in them and to keep the elevators running. None of the employes were assigned to any particular tenant, the only division of labor being by certain floors. A porter or janitor on a floor covers everybody on that floor, the same service being given to all of the tenants in the building whether they are in intrastate commerce or interstate commerce."

character in or about the building. None of Appellee's tenants were engaged in the production of goods elsewhere, but some of them were agents for concerns so engaged—not in or about the building but generally outside of Texas.

So that whether we look alone to the wording of Sections 6(a) and 7(a) respecting the "production of goods for commerce" or the definition of "produced" found in Section 3(j) of the Act,[3] it is perfectly clear that neither Appellants nor any person with whom Appellants had any sort of contact or sustained any kind of relation was engaged in or about the building in the production of goods for commerce within the meaning of the Act.

Appellants apparently rely upon Arsenal Building Corporation and Kirschbaum v. Walling (two cases), 316 U.S. 517, 62 S.Ct. 1116, 1118, 86 L.Ed. 1638. There, some of the employees were, as here, elevator operators, porters, and janitors in the employ of owners and operators of large buildings, but there the tenants of both buildings were principally engaged in the production of goods for commerce, and some of the employees in some instances handled some of the goods so produced.[4] It is perfectly plain that Appellants' case is not helped by that case.

But while neither Appellants, nor Appellee, nor Appellee's tenants were engaged in the production of goods for commerce in or about the building, a substantial number of Appellee's tenants were, as stated, "engaged in commerce" within the meaning of the Act. And Appellants who were the elevator operators say that, under the facts here, it follows that they were also so engaged, and that they were within the coverage of the Act. A similar claim is made by the Appellants who were porters and janitors.

While the provisions of the Act (Sections 6 and 7) with respect to "the production of goods for commerce" have, because of the liberal definition of production found in the Act (Section 3(j), been given a broad construction (United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L. Ed. 609, 132 A.L.R. 1430; Arsenal Building Corporation and Kirschbaum v. Walling, supra; Warren-Bradshaw Drilling Company v. Hall, 63 S.Ct. 125, 87 L.Ed. ——, decided November 9, 1942; and other similar cases), we do not think that Congress intended that the Act with respect to those who are only "engaged in commerce" should be stretched and strained to cover every person whose labor is of use or convenience or whose labor in some fashion

---

[3] Subdivision (j) of Section 3 of the Act defines "produced" and is as follows: "(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods, if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

[4] We quote the facts as they appear in the Opinion: "The facts in the two cases differ only in minor detail. In No. 910, the petitioner owns and operates a six-story loft building in Philadelphia. The tenants are, for the most part, manufacturers of men's and boys' clothing. In No. 924, the petitioners own and operate a twenty-two story building located in the heart of the New York City clothing manufacturing district. Practically all of the tenants manufacture or buy and sell ladies' garments. Concededly, in both cases the tenants of the buildings are principally engaged in the production of goods for interstate commerce. In No. 910, the petitioner employs an engineer, three firemen, three elevator operators, two watchmen, a porter, a carpenter, and a carpenter's helper. In No. 924, the controversy involves two firemen, an electrician, fourteen elevator operators, two watchmen, and six porters. These employees perform the customary duties of persons charged with the effective maintenance of a loft building. The engineer and the firemen produce heat, hot water, and steam necessary to the manufacturing operations. They keep elevators, radiators, and fire sprinkler systems in repair. The electrician maintains the system which furnishes the tenants with light and power. The elevator operators run both the freight elevators which start and finish the interstate journeys of goods going from and coming to the tenants, and the passenger elevators which carry employees, customers, salesmen, and visitors. The watchmen protect the buildings from fire and theft. The carpenters repair the halls and stairways and other parts of the buildings commonly used by the tenants. The porters keep the buildings clean and habitable."

contributes to the comfort or convenience of one who is so engaged. Overstreet v. North Shore Corporation, 5 Cir., 128 F.2d 450. Clearly, Congress intended the coverage of the Act to stop somewhere, and the line bounding coverage must be drawn somewhere.

In the Arsenal Building-Kirschbaum cases, supra, it is said by the Supreme Court: " 'There is thus no point in the instant case in a demand for the drawing of a mathematical line. And what is reasonably clear in a particular application is not to be overborne by the simple and familiar dialectic of suggesting doubtful and extreme cases.' Santa Cruz Fruit Packing Co. v. Labor Board, 303 U.S. 453, 467, 58 S.Ct. 656, 660, 82 L.Ed. 954. 'What is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation.' Gully v. First National Bank, 299 U.S. 109, 117, 57 S.Ct. 96, 100, 81 L.Ed. 70."

Applying the common sense rule, we hold that Appellants are not within the coverage of the Act.

We do not find it necessary to discuss or determine other questions presented.

The judgment of the lower Court should be and is affirmed.