**ADDISON v. COMMERCIAL NAT. BANK IN SHREVEPORT.**

Civil Action No. 1974.

District Court, W. D. Louisiana, Shreveport Division.

March 31, 1947.

Robert J. Newson, of Shreveport, La., for plaintiff.

Cook, Clark & Egan, by C. D. Egan, all of Shreveport, La., for defendant.

DAWKINS, District Judge.

Plaintiff sues for overtime, liquidated damages and penalties under the Fair Labor Standards Act, 29 U.S.C.A. §§ 206, 207 et seq. He alleges that defendant operated a national bank in a building owned by it, and that "practically all of the remaining space," more than fifty per cent, "is occupied by concerns engaged in interstate commerce"; that his duties required him to assist "in the maintenance of said building and banking house, and in inspecting every door and lock in said building, including said banking house every night * * *"; that the period of his employment was from December 17, 1945, to April 1, 1946, at the rate of $120 per month, and from April 1 to July 8, 1946, at the rate of $124 per month, and that he worked twelve and one-half (12½) hours overtime each week during the entire period. His claim is for one and one half times the hourly rates above forty hours per week for both periods, or a total of $615.10, and a like amount as liquidated damages, together with $500 as attorneys' fees, or a grand total of $1730.20.

Defendant admits the employment and ownership of the building, but denies that plaintiff was covered by the provisions of the Act. It also averred that plaintiff, at his own request, was given two jobs which had previously been held by two persons at $60 per month for the first period above, and $62 for the second period from April 1st to July 8, 1946.

The facts are not in serious dispute, except as to the averment of defendant that plaintiff was holding two jobs at his own request. His duties were those of a night janitor or clean-up man, and operator of an elevator, for which he received wages as alleged in the complaint. According to his own testimony, he came on duty at 6:30 P.M. and quit about 7:00 A.M., Mondays through Fridays; Saturdays from 6:00 P.

M. to 7:00 A.M., and Sundays, 5:00 P.M. to 7:00 A.M. The elevator was operated until midnight, for the few persons who had occasion to go into the building after the usual office hours, from the time he took over in the evening, and after that time, that is, midnight, if anyone happened to be in the building and wished to leave he let them out. The building was closed to entrance from the outside at twelve midnight.

After locking the front door at that hour, plaintiff went to the top of the building of some fifteen stories and proceeded downward "checking every door at each office, and going in and turning off the lights" when they were left burning. When he got to the bottom, he checked upon the stairways and cleaned them and then went into the bank, checking the bank doors, back and front, to see if any had been left open, turned out lights found burning, and mopped the lobby of the bank and stairways to the mezzanine floor, as well as those into the basement. He also mopped the four elevators and swept the sidewalk around the building. Early in the morning, he opened up the doors to let the maids in to get the offices ready for the tenants. He then went back to the fifteenth floor and came down, turning on the hall lights on all floors and opening up the fire escapes, toilet doors of the building, etc. He had nothing to do in the bank itself except to let the maids in to do the cleaning.

The bank occupied the first floor and basement, mezzanine and most of the second floor. It also retained regularly the services of a private detective agency to guard the banking quarters. The building had several tenants, who, like the Gulf Refining Company, were engaged in the oil business in more than one state, but did not carry on any of their manufacturing operations therein, although they kept offices for executives, accounting clerical help, etc. therein. The Gulf also operated a telegraph system, receiving and sending messages to its plants and offices in other states.

Prior to plaintiff's employment, the work which he performed had been done by two persons, an elevator operator and a cleaner, who also checked lights, doors, etc., each of whom was paid $60, but the plaintiff asked that he be permitted to do the work of both

in order that he might earn sufficient for a living.

The question presented is, was the plaintiff engaged in the production of goods for commerce, and if not, was he engaged in commerce, or the performance of duties so closely related thereto, as to be for practical purposes a part of Interstate Commerce?

Plaintiff has cited a number of cases in support of his contention, in which duties similar to those involved here, were performed, and in which it was held that the persons so employed, were covered by the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. The first case is that of Baldwin v. Emigrant Industrial Savings Bank, 2 Cir., 150 F.2d 524, 525. There the plaintiffs were operators of both passenger and freight elevators, porters, watchmen and firemen. The District Court found that a substantial number of tenants in the building occupied offices, storerooms, showrooms for taking orders for goods manufactured elsewhere, which were sold to customers, both within and without the state, and were thus engaged in interstate commerce. The Court said: "But this does not mean that the plaintiffs, too, are engaged in interstate commerce, for their activities are not 'actually in or so closely related to the movement of the commerce as to be a part of it'." citing authorities. Thus the contention that the plaintiffs were themselves engaged in interstate commerce was eliminated, and the Court turned to the second proposition as to whether they were engaged in the production of goods for commerce. Reference was made by the Court of Appeals in that case to the fact that in Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L. Ed. 1638, the Supreme Court had held that "service employees of a building occupied by tenants engaged in manufacturing are in an occupation necessary to the production of goods for commerce, and therefore within the coverage of the Act." Reference was also made by the Court in the Baldwin case to the holding of the Second Circuit in Callus v. 10 East Fortieth Street Bldg., Inc., 2 Cir., 146 F.2d 438, in which it had been found that more than twenty per cent of the rental space in the building "was devoted largely to miscellaneous of-

fices of manufacturers," and for that reason, it was decided that the statute applied, but the Supreme Court had reversed that decision on the ground that "renting of office space used for the carrying on of ordinary office activities 'is local business and makes the employees of such a building engaged in local business'." 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806, 161 A.L.R. 1263. The Court then concluded that the issues turned on the proposition as to whether the tenants were actually engaged in manufacturing in the building itself, as distinguished from the maintenance of offices, and stated its interpretation of the decision by the Supreme Court with conclusions as follows:

"The line it drew appears to be that maintenance employees of a building such as the one here involved are covered by the Act only if a substantial amount of the rentable area is devoted to the *actual physical production on the premises of goods for interstate commerce.* What proportion of the total rentable area would be considered a substantial amount is not stated in express terms. The dissenting Justices did refer to the Administrator's standard, saying, however, that whether 20 per cent occupancy was a reasonable minimum was not in issue, since the 32.5 per cent occupancy for production was clearly so substantial as to remove any doubt. There seems to us, therefore, no reason to withdraw our approval of the Administrator's conclusion; but as we shall see, here, too, considerably more than 20 per cent of the building is occupied for activities necessary to the production of goods for commerce." (Emphasis by the writer of this opinion.)

The next case relied upon by plaintiff is that of Bozant v. Bank of New York, 2 Cir., 156 F.2d 787, 789, in which the opinion was written by Circuit Judge Learned Hand. The demand was also for overtime under Sec. 16(b) of the Fair Labor Standards Act of 1938, Sec. 216(b), Tit. 29 U.S. C.A., and had been dismissed on a motion for summary judgment. It alleged that the plaintiffs, twenty-two in number, were "maintenance" or "service" employees, who took care of the building owned by the defendant. The matter was heard in the lower court on affidavits. The Court of Appeals found, from proofs, that the "bank itself occupied fifty per cent of the rental space in the building, and leases the remainder to other tenants. Of these, about sixteen per cent are firms doing a banking business, which may be taken as the same as that of the bank; six per cent are brokers; and about twenty per cent are lawyers." The Court then proceeded as follows:

"In deciding that issue we must take against the defendant every question as to which there is the least doubt, for the appeal is from a summary judgment. Some of the activities which went on, we agree should on no theory be counted. A lawyer who in the course of his practice writes letters, or draws deeds or wills, or prepares briefs and records, is not on that account within § 203(j); and the same is true of the correspondence of a broker and of a banker. The definition of 'goods' in § 203(j) might literally go so far even as that; but it would be unreasonable to the last degree to suppose that Congress meant to cover such incidents of a business whose purpose did not comprise the production of 'goods' at all. Indeed, were it otherwise, the Act would sweep into its maw every business, however local, which manufactured nothing whatever, merely because it was carried on by correspondence, which is the case with all business. The preparation of advertisements, brochures, pamphlets and other advices mailed out to customers, we cannot pass upon on this record. There are businesses in which similar activities take on immense proportions; illustrated and illuminated books and booklets go out in great numbers and of most substantial size. That of itself may be a production of 'goods,' though it be only auxiliary to a business which involves no other production. We leave this element of the case to be developed on the trial, even though the Bank has not gone in for anything comparable in size to what we have just mentioned. Last—and most important for the case before us—of the Bank's activities is the preparation or execution of commercial paper, whether documents of permanent investment, like shares of stock or bond issues, or short term obligations, like negotiable notes, or documents which are, strict-

ly speaking, not obligations at all, but bills of lading, and the like. All these the law is disposed to think of, not as records of rights of action, but as the very rights themselves. Bonds have never been considered only as evidences of obligation; from the earliest times they have been treated as the very obligations, and that notion persists. Bacon v. Hooker, 177 Mass. 335, 337, 58 N.E. 1078, 83 Am.St. Rep. 279; Blackstone v. Miller, 188 U.S. 189, 206, 23 S.Ct. 277, 47 L.Ed. 439; United States Fidelity & Guaranty Co. v. Riefler, 239 U.S. 17, 25, 36 S.Ct. 12, 60 L.Ed. 121. Bills of exchange, negotiable notes and most commercial paper are also usually treated as 'specialties,' and in this respect assimilated to bonds. Williston on Contracts, § 1890. For some purposes shares of stock and bills of lading are in the same class. Restatement of Conflicts of Laws, § 53, §§ 103 and 104(3). It by no means unduly strains § 203(j) to regard the preparation, execution or other validation of such documents as the actual 'production of goods.' 'Goods' in most senses they are, quite as truly as ordinary chattels, and § 203(i), it must always be remembered, was amended in Congress to go beyond 'wares, products, commodities, merchandise, or articles,' and in addition to include 'subjects of commerce of any character.' Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414, does not stand in the way of this conclusion; the difficulty there was that the telegrams, taken as documents, were not 'shipped' across a state line; but of the telegrams themselves the court said: 'We think telegraphic messages are clearly "subjects of commerce" and hence that they are "goods" under this Act, as alleged in the complaint,' (323 U.S. at pages 502, 503, 65 S.Ct. at page 341, 89 L.Ed. 414). Nor is it necessary that the whole document shall be prepared in the building. 'Production' as defined in § 203(j) covers 'in any other manner worked on' and to execute, or endorse, or in any other other way to validate, an incomplete document of the kind we are considering is to work on it; indeed that is the only work upon it that gives it value; until then it is merely a scrap of paper. Again we may take recourse to Western Union Telegraph Co. v. Lenroot, supra, 323 U.S. at page 503, 65 S.Ct. at page 342, 89 L.Ed. 414: 'We are clear that "handled" or "worked on" includes every kind of incidental operation preparatory to putting goods into the stream of commerce'."

The Court in the Bozant case then discussed those of 10 East 40th Street Building, Inc., v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806, and Borden Co. v. Borella, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865, in each of which the Court of Appeals for the Second Circuit had held that "maintenance employees" were covered by the Fair Labor Standards Act, and involved large office buildings in the city of New York, occupied by many tenants. In the first of those two cases, the facts were that the owner of the building had carried on no business of its own; in the second, the owner, Borden Company, occupied more than one-half the space for its executive offices. The Supreme Court reversed the first, but affirmed the Borden case. It was said in Bozant that the "decisive distinction" made by the Supreme Court "was that Borden Company owned the building and itself made use of it as part of its production of goods for commerce: i.e. milk." The following was then quoted from the decision in the 10 East 40th Street Building, Inc. case from pages 583 et seq. of 325 U.S., from page 1230 of 65 S.Ct:

"* * * an office building exclusively devoted to the purpose of housing all the usual miscellany of offices has many differences in the practical affairs of life from a manufacturing building, or the office building of a manufacturer."

Attention was also called in the Bozant case to the fact that the Supreme Court had distinguished the last mentioned case (10 East 40th Street Building, Inc.) from that of Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, on the ground that "no actual physical manufacturing went on in the 40th Street Building."

Other cases are cited for plaintiffs in the present case, but those above are the most apposite, and I think show the distinction between cases which have and those which have not sustained the claims of employees of the character involved here. In most of

them, it was found that the plaintiffs, themselves, were not engaged in commerce within the meaning of the statute, but were employed in buildings where goods were actually, physically being produced for commerce. In the present case there is no showing that the manufacturing or producing of goods for commerce was carried on, the circumstances being substantially similar to those in the following cases, in which the right to recovery was denied:

Brandell et al. v. Continental Illinois Nat. Bank & Trust Co., D.C., 43 F.Supp. 781; Stoike v. First Nat. Bank of New York, 290 N.Y. 195, 48 N.E.2d 482; and Johnson et al. v. Dallas Downtown Development Co., 5 Cir., 132 F.2d 287. In the first of these (Brandell), the plaintiff alleged that the defendant was a national bank with a capital of $50,000,000, one of the largest of the United States, engaged in interstate commerce, and set "out in detail transactions of defendant," alleged to constitute interstate commerce; that it owned and operated a large building of twenty-three stories, the first basement, one-half of the second basement, all of the first six floors, one-half of the seventh floor, part of the twenty-first floor, and all of the twenty-second and twenty-third floors being occupied by the bank, and used by it in carrying on its said banking business; the remainder being rented to a large number of tenants who were "engaged 'in the production of goods, trade, business, finance, transmission and communication for and in interstate commerce' "; that plaintiffs were employed as janitors, motormen, engineers, electricians and plumbers, firemen, steamfitters, windowwashers, scrubwomen, porters, guards, carpenters, watchmen, oilers, mechanics, utility men and elevator operators. They further alleged that they had worked more than forty hours a week and were entitled to overtime, damages and penalties. The Court stated the issue to be whether the plaintiffs showed they were engaged in commerce or in the production of goods for commerce. It quoted the definition of "goods" given in the Act, as well as that of "production," which the Act says "means produced, manufactured, mined, handled, or in any other manner worked on in any state," and, "for the purpose of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any state." 29 U.S.C.A. § 203(b, i, j). The opinion then proceeds:

"Given the broadest interpretation, I do not see how the statute could be construed to cover these plaintiffs. We do not have here the case of a janitor or watchmen or firemen in a building given over exclusively, or almost exclusively, to a business engaged in interstate commerce. Defendant occupies about one third of the building. The other portions are occupied by we know not whom (plaintiffs say some of the occupants are engaged in interstate commerce but that is their counsel's opinion. No facts are given from which the court can determine whether the allegation states the truth). As an office building the probabilities are that a large proportion of the tenants are lawyers, doctors, accountants, architects, engineers and the like. Plaintiffs give no service to defendant except such as is incidental to their maintenance and servicing of the entire building.

"Conceding that defendant is engaged in interstate commerce, as to which, however, I express no opinion, the hours provisions of the Act do not apply to all of its employees but only those engaged in the production of goods for interstate commerce and are not covered by the Fair Labor Standards Act."

Stoike v. First National Bank of New York, [290 N.Y. 195, 48 N.E.2d 483] was by the Court of Appeals of New York (court of last resort), involved a claim under the Fair Labor Standards Act by a night porter, and the circumstances surrounding his employment were described as follows:

"The case comes to us on an agreed statement of facts, Civil Practice Act, § 546, from which it appears that the plaintiff was employed by the defendant bank on November 29, 1937, as a night porter, his duties being to clean portions of the defendant's twenty-one story building at No. 2 Wall Street in the city of New York.

Of the twenty-one stories the first four, two mezzanines and two basements were occupied by the defendant as banking quarters, the upper seventeen stories being rented to tenants. It was incumbent upon the defendant's building superintendent to arrange each night for the cleaning of the entire building from top floor to basement. To that end there were employed eleven porters who cleaned first the defendant's banking quarters and then the upper floors occupied by tenants. The plaintiff was in the appellant's employ from November 29, 1937 until he voluntarily left on April 15, 1939. In the early period of his employment—both before and after the effective date of the Fair Labor Standards Act—the plaintiff did considerable work in the defendant's banking quarters, dusting and cleaning tables, chairs and office furniture or scrubbing floors and stairs. During the later period of his employment he spent the greater portion of his working hours cleaning public corridors and washrooms on the upper floors."

In disposing of the case, the New York Court held that the burden was upon the plaintiff to show that he came within the terms of the Act, citing Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83. It next analyzed the statute and reviewed the decisions of the Supreme Court of the United States, pointing out the distinction in the Act between those engaged in interstate commerce, and those producing goods for commerce, whereby, in order to come within the former class, the duties have to be so closely connected with the interstate commerce as to, in effect, form a part thereof, whereas, an employee in the business of producing goods for commerce was to be covered "if such employee was employed in producing, manufacturing, mining, handling, transporting, or * * * in any process or occupation *necessary* to the production thereof, in any state." Sec. 3(j). (Emphasis by the writer.)

The final summation and conclusion of the New York court, whose standing as authority is well recognized, is so comprehensive and analogous to the case now before the court, it is felt that extended quotation therefrom is justified:

"There seems to be no question that the federal statute casts upon the plaintiff the burden of proving that in the performance of work for which he was employed by the defendant he was engaged in interstate commerce or in the production of goods for interstate commerce during the period of asserted overtime employment. Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83.

"In the argument before us counsel for the plaintiff conceded that dusting and cleaning, as performed under ordinary circumstances, do not constitute interstate commerce. But it is said that when, as in the present case, the functions of dusting and cleaning are performed by one as an employee of a bank, the business of which in part is interstate commerce, the employee is engaged in interstate commerce. The plaintiff's argument is that his labors served to facilitate work performed in the defendant's private banking quarters where commerce starts—where specie and currency are shipped to points outside the State, where credit is entered and where those other services are rendered which are within that wide range of transactions, common to commercial banking.

"The defendant, for the purpose of the argument only, concedes that at least a part of the banking services performed in its banking quarters constitutes interstate commerce. It contends, however, and the Appellate Division has recognized that this '* * * is not a case where the employee was in anywise engaged in the production of goods for commerce.' 264 App.Div. 585, 586, 36 N.Y.S.2d 390, 391. Accordingly the defendant's argument goes to the narrow question whether the plaintiff, at the time of his overtime employment, was 'engaged in' interstate commerce within the intended meaning of section 7(subd. a) of the Act.

"In support of its position we are told by the defendant that, even upon the assumption that its banking business is interstate commerce, the plaintiff has failed upon the record before us to show that the character of his work of cleaning and dusting bore such a relation to the defendant's banking activities as to justify a finding that plaintiff's activities themselves consti-

tuted interstate commerce. In other words the defendant, as the employer, does not stress the nature of its business. Rather does it place emphasis upon the character of work done by the plaintiff as its employee —thus conforming with the rule that ' * * * the provisions of the Act expressly make its application dependent upon the character of the employees' activities.' Kirschbaum Co. v. Walling, 316 U.S. 517, 524, 62 S.Ct. 1116, 1120, 86 L.Ed. 1638.

"In reaching a decision favorable to the plaintiff the Appellate Division recognized the fact that Congress had defined certain words and phrases as used in the Act. The statute provides, § 3, subd.(j), that 'For the purposes of this Act an employee shall be deemed to have been engaged in *the production of goods* if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation *necessary* to the production thereof, in any State.' (Emphasis supplied.) But the definition of 'commerce' (§ 3, subd. b), as that word is used in the Act, is not so broad in scope: ' "Commerce" means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof.' The Appellate Division determined that there is no substantial distinction between the two categories of employment described by those statutory definitions and ruled that Congress did not intend to differentiate between the two types of employment, thus defined. In other words, in construing section 7(subd. a) of the Act, the Appellate Division seems to have combined the two definitions, quoted above, by transposing the word 'necessary' from its context in the definition of 'production of goods' to the definition of 'commerce.' It has thus produced a resulting composite definition which it has adopted as the basis for its ruling that employees who are engaged in activities 'necessary'—not to the 'production of goods' but—to 'interstate commerce,' are entitled to the benefit of the Act. But the statute does not expressly so state. To the contrary, by defining words and phrases used in the Act, Congress made clear its intention to distinguish *between employees*

*engaged in interstate commerce* and those engaged in *the production of goods for interstate commerce.*

"We may not disregard the definitive language thus employed; nor may we by judicial construction give effect to an assumed congressional intent. When by definition Congress differentiated between 'commerce' and 'production of goods for commerce,' we may not assume it was wholly without purpose. Cudahy Packing Co. v. Holland, 315 U.S. 357, 366, 62 S.Ct. 651, 86 L.Ed. 895. 'When in order to protect interstate commerce Congress has regulated activities which in isolation are merely local, it has normally conveyed its purpose explicitly.' Federal Trade Commission v. Bunte Bros., Inc., 312 U.S. 349, 351, 61 S.Ct. 580, 582, 85 L.Ed. 881. Furthermore, the legislative history of the enactment of the Fair Labor Standards Act indicates an effort by Congress to restrict the scope of the Act rather than to extend the limits of its field of operation. See Kirschbaum Co. v. Walling, supra, 316 U.S. pages 522, 523, 62 S.Ct. 1116, 86 L.Ed. 1638.

"We think that in framing section 7 (subd. a) of the Act Congress intended definitely to distinguish between the scope of those categories of employees which it described as being 'engaged in commerce' and those 'engaged in the production of goods for commerce.' The phrase 'in commerce' was not intended to include within its scope that wide field of activities which remotely *affect* interstate commerce. Whenever Congress, acting under the commerce clause, has wanted to embrace that broader field it has definitely expressed that purpose. Among many examples of such explicit phrasing is found section 10(subd. a) of the National Labor Relations Act, 49 Stat. 449-457, 29 U.S.C.A. §§ 152(7), 159 (c), 160(a), where power was given to the National Labor Relations Board 'to prevent any person from engaging in any unfair labor practice * * * *affecting* commerce.' (Emphasis supplied.) In that connection the Supreme Court of the United States in two recent cases—Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 and Higgins v. Carr Bros. Co., 317 U.S. 572, 63 S.Ct. 337, 87 L.Ed. 468, decided January 18, 1943—

626

has pointed out that while Congress saw fit in the National Labor Relations Act, (supra), to extend federal control to activities 'affecting commerce,' it chose to confine the application of the Fair Labor Standards Act within narrower limits. It was that restriction to which the same court had previously referred when, in considering the Fair Labor Standards Act, it said—'The history of the legislation leaves no doubt that Congress chose not to enter areas which it might have occupied.' Kirschbaum Co. v. Walling, supra, 316 U.S. pages 522, 523, 62 S.Ct. page 1119, 86 L.Ed. 1638. 'The question of the Act's coverage depends on the special facts pertaining to the particular business.' Walling v. Jacksonville Paper Co., supra, 63 S.Ct. page 337, 87 L.Ed. 460.

"In our endeavor to interpret the phrase 'engaged in commerce' we adopt and apply to our present problem the 'practical test' suggested in Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 497, 87 L.Ed. 656, decided Feb. 1, 1943—Was the plaintiff's work of dusting and cleaning the defendant's banking quarters so closely related to interstate commerce as to be 'in practice and in legal contemplation a part of it.' See, also Pederson v. Delaware L. & W. R. Co., 229 U.S. 146, 151, 33 S.Ct. 648, 57 L.Ed. 1125, Ann.Cas.1914C, 153; Shanks v. Delaware, L. & W. R. Co., 239 U.S. 556, 560, 36 S.Ct. 188, 60 L.Ed. 436, L.R.A.1916C, 797. By the application of that test we think that one of those 'areas' which Congress chose not to occupy when it fixed the scope of section 7 (subd. a) was employment such as the plaintiff's. It is our conclusion that the cleaning operations which plaintiff was required to perform in defendant's banking quarters were not so closely related to the many banking services performed there that we can say as matter of law that plaintiff's cleaning was a part of such banking services and therefore that he was 'engaged in' interstate commerce. The plaintiff's work of cleaning and dusting the quarters in which the functions of banking are performed, although it may contribute remotely to the comfort and convenience of those whose services are vital to its business, is not a step in the process of banking. Indeed, as we consider the activities of those who conduct the vital functions by which the business of the defendant bank is accomplished, the essential characteristics of that portion of its banking service which is interstate commerce are lost before we reach the position held by the plaintiff. If, under the guise of construing section 7 (subd. a), we extend its application beyond those employees who are 'engaged in' interstate commerce and include that vast number of employees whose work, like that of the plaintiff, only remotely affects commerce, we would extend the operation of the Act beyond its intended scope.

"We are not unmindful that in Kirschbaum Co. v. Walling, supra, the provisions of section 7 (subd. a), with respect to 'the production of goods for commerce,' have—because of the liberal definition of the phrase 'production of goods' § 3(j)—been given a broad construction. But that case, as we view it, is not controlling here where the plaintiff does not claim we are dealing with a problem involving 'the production of goods for commerce.'

"The judgment of the Appellate Division should be reversed and judgment directed in favor of the defendant on the submitted controversy, with costs in this court."

Certiorari to the Supreme Court was denied, 320 U.S. 762, 64 S.Ct. 50, 88 L.Ed. 455.

In Johnson et al. v. Dallas Downtown Development Co., 5 Cir., 132 F.2d 287, 289, the defendant operated an office building in the city of Dallas, Texas, and its tenants were engaged in various kinds of business, but none produced goods for commerce therein or elsewhere, although some were agents of persons who engaged in production in other places. The thirteen plaintiffs were employees of the owner of the building, six being elevator operators, and seven being porters or janitors, who sought relief under the Fair Labor Standards Act, claiming overtime, damages and attorney's fees. The claim was made under both categories (Sec. 6(a) and 7(a) of the Act), that is, that the plaintiffs were working both in interstate commerce and in the production of goods for commerce. The Court of Appeals for this, the Fifth Circuit, disposed of this case as follows:

"So that whether we look alone to the wording of Sections 6(a) and 7(a) respecting the 'production of goods for commerce' or the definition of 'produced' found in Section 3(j) of the Act, it is perfectly clear that neither Appellants nor any person with whom Appellants had any sort of contact or sustained any kind of relation was engaged in or about the building in the production of goods for commerce within the meaning of the Act.

"Appellants apparently rely upon Arsenal Building Corporation and Kirschbaum v. Walling (two cases), 316 U.S. 517, 62 S.Ct. 1116, 1118, 86 L.Ed. 1638. There, some of the employees were, as here, elevator operators, porters, and janitors in the employ of owners and operators of large buildings, but there the tenants of both buildings were principally engaged in the production of goods for commerce, and some of the employees in some instances handled some of the goods so produced. It is perfectly plain that Appellants' case is not helped by that case.

"But while neither Appellants, nor Appellee, nor Appellee's tenants were engaged in the production of goods for commerce in or about the building, a substantial number of Appellee's tenants were, as stated, 'engaged in commerce' within the meaning of the Act. And Appellants who were the elevator operators say that, under the facts here, it follows that they were also so engaged, and that they were within the coverage of the Act. A similar claim is made by the Appellants who were porters and janitors.

"While the provisions of the Act (Sections 6 and 7) with respect to 'the production of goods for commerce' have, because of the liberal definition of production found in the Act (Section 3(j), been given a broad construction (United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Arsenal Building Corporation and Kirschbaum v. Walling, supra; Warren-Bradshaw Drilling Co. v. Hall, [317 U.S. 88,] 63 S.Ct. 125, 87 L.Ed. 83, decided November 9, 1942; and other similar cases), we do not think that Congress intended that the Act with respect to those who are only 'engaged in commerce' should be stretched and strained to cover every person whose labor is of use or convenience or whose labor in some fashion contributes to the comfort or convenience of one who is so engaged. Overstreet v. North Shore Corporation, 5 Cir., 128 F.2d 450. Clearly, Congress intended the coverage of the Act to stop somewhere, and the line bounding coverage must be drawn somewhere.

"In the Arsenal Building-Kirschbaum cases, supra, it is said by the Supreme Court: ' "There is thus no point in the instant case in a demand for the drawing of a mathematical line. And what is reasonably clear in a particular application is not to be overborne by the simple and familiar dialectic of suggesting doubtful and extreme cases." Santa Cruz Fruit Packing Co. v. Labor Board, 303 U.S. 453, 467, 58 S.Ct. 656, 660, 82 L.Ed. 954. "What is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation." Gully v. First National Bank, 299 U.S. 109, 117, 57 S.Ct. 96, 100, 81 L.Ed. 70.'

"Applying the common sense rule, we hold that Appellants are not within the coverage of the Act."

It is not deemed necessary to review the large number of other cases cited by counsel on either side. Those considered here are among the leading ones which seem to control the present case.

The jurisprudence thus seems to establish that employees, performing services of the character involved in this case, are not themselves in or discharging duties in interstate commerce, even though the employer may conduct a business requiring the use of interstate channels, for the reason that the work is too remote from such commerce. And the facts in this case do not disclose the manufacture or production of goods for interstate commerce, within the meaning of the Act.

The conclusion is that the plaintiff was neither employed in commerce, nor engaged in the production of goods for commerce within the meaning of the Fair Labor Standards Act. The demand should, therefore, be rejected.

Proper decree should be presented.