George P. SHULTZ, Secretary of Labor, United States Department of Labor,

v.

TRAVIS–EDWARDS, INC.

Civ. A. No. 15083.

United States District Court,
W. D. Louisiana,
Shreveport Division.

Nov. 4, 1970.

L. H. Silberman, Sol. of Labor, U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell, Roger J. Martinson, U. S. Dept. of Labor, Atlanta, Ga., for plaintiff.

Larry M. Lesh, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., Harry R. Nelson, Nelson & Evans, Shreveport, La., for defendant.

## OPINION

DAWKINS, Chief Judge.

The Secretary of Labor (the "Secretary") instituted this action under Section 17 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq., alleging that defendant Travis-Edwards, Inc. ("Travis-Edwards") has two or more employees engaged in commerce or in the production of goods for commerce within the meaning of the Act; and that Travis-Edwards is therefore an enterprise covered by the Act. The Secretary seeks judgment (1) permanently enjoining Travis-Edwards from allegedly violating the minimum wage, overtime, and record-keeping provisions of the Act and (2) restraint against the withholding of payment of minimum wage and overtime compensation.[1]

The material facts in this action have been stipulated. The only issue remaining for the Court to determine is whether Travis-Edwards is a covered enterprise within the meaning of Section 3(s) (1), 29 U.S.C. § 203(s) (1).

"(s) 'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which—

"(1) during the period February 1, 1967, through January 31, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level which are separately stated) or is a gasoline service establishment whose annual gross volume of sales is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated);
\* \* \*."

[There is no question that Travis-Edwards met the dollar volume requirements.]

## FACTS

Travis-Edwards is a corporation engaged in the operation of the Henry C. Beck Building, a twenty-story office building located in Shreveport, Louisiana, which leases office space to a miscellany of tenants. During the period at issue, Travis-Edwards employed the following classes of personnel:

1. *Office employees*, who regularly and customarily performed various clerical and bookkeeping duties including the preparation and making of rent ledgers, bank deposits, and accounts receivable and payable. These facts and figures are assimilated into three reports which are mailed to officers and stockholders, some of which are outside Louisiana.

2. *Engineers* (Boiler-room employees), who regularly utilize and install materials such as fluorescent tubes, ballasts, screws, washers, etc., in the maintenance of the building. A substantial portion of the materials used are produced outside Louisiana.

3. *Maids and porters*, who regularly use waxes, detergents, and other items which are customarily used in the maintenance of offices. A substantial portion of these goods comes from outside Louisiana.

4. One *maid-elevator operator*, who in addition to her regular duties as a maid, operates an elevator when it is

---

1. The parties have agreed that the sum due, if any, is $9,558.43 for wages alleg- edly due from April 26, 1967, to January 1, 1970.

used to transport deliverymen with large deliveries. The maid takes no part in the physical handling of freight delivered to tenants. Her main purpose is to operate the elevator in order to assure that it is promptly returned to the basement, changed back to automatic operation and made available to building tenants. A substantial portion of the freight delivered to tenants was and is in transit from points outside Louisiana by common carrier.

5. *Parking lot attendants,* who regularly drive and park automobiles for tenants and the public. These, of course, are manufactured outside of Louisiana.

6. *Concession stand employees.* Two employees operated a concession stand where cigarettes, notions, and various and sundry supplies were sold to the public. A substantial portion of these products were produced outside Louisiana and shipped here to a wholesaler who in turn supplied the concession stand. The average monthly gross receipts for the stand's operation was approximately $4,-000. January 16, 1970, defendant leased the space occupied by the concession stand to a third party and sold all equipment and inventory used in its operation.

### COVERAGE UNDER THE ACT

The Court's only inquiry in this action is to determine if Travis-Edwards is an "enterprise" subject to the Act's coverage. The Act bases coverage on engagement in "commerce" or "production of goods for commerce." A conscious choice was made by Congress not to structure the Act in terms of "affecting commerce."[2] Thus, it is clear that the limits of the Act are more restricted than the broader constitutional limitations and call for an analysis of each case in light of its unique factual circumstances.[3]

Relying on each of the classifications of employees, the Secretary alleges that Travis-Edwards has employees who are individually covered as well as employees "handling, selling, or otherwise working on goods that have been moved in or produced for commerce." In examining these contentions, each employee classification is examined in light of the claimed statutory basis for coverage.

### I. Office Employees

The Secretary urges that the statutory definition of "goods"[4] and "produced"[5] encompass the work performed by defendant's office employees in connection with the numerous accounts, reports, analyses, and correspondence which they work upon and mail out of the State. He contends these activities constitute "production of goods for commerce." In support of that position, the Secretary cites numerous cases in which office employees have been found to be engaged in commerce or in the production of goods for commerce and thus subject to the Act's coverage.[6]

Significantly, in each of the cited cases, the office employees were engaged in activities which were *incidental to interstate business or interstate business transactions.*

---

2. See, *e. g.,* S.Rep.No.145, 87th Cong., 1st Sess. (1961) in 2 U.S.Code Cong. & Adm. News (1961), pp. 1620, 1662.

3. Justice Frankfurter noted:
   "When these provisions [the Act] first came here we made it abundantly clear that their enforcement would involve the courts in the empiric process of drawing lines from case to case * * *." 10 East 40th Street Building, Inc. v. Callus. 325 U.S. 578, 579, 65 S.Ct. 1227, 1228, 89 L.Ed. 1806.
   " * * * Our problem is not an exercise in scholastic logic." *Id.,* at 583, 65 S.Ct. at 1230.

4. 29 U.S.C. § 203(i), see *infra,* text at n. 9.

5. 29 U.S.C. § 203(j).

6. See, *e. g.,* Allen v. Atlantic Realty Co., 384 F.2d 527 (5th Cir. 1967); Credit Service, Inc., v. Fleming. 372 F.2d 143 (5th Cir. 1967); Wirtz v. Gulfco Investment Group, Inc., 50 L.C.Para. 31,640 (W.D.La.1964); Beneficial Finance Co. of Wisconsin v. Wirtz, 346 F.2d 340 (7th Cir. 1965); Wirtz v. First State Abstract & Ins. Co., 362 F.2d 83 (8th Cir. 1966); Wirtz v. Wardlaw, 339 F.2d 785 (4th Cir. 1964).

The Supreme Court in 10 East 40th Street Building, Inc. v. Callus,[7] concluded:

"Renting office space in a building exclusively set aside for an unrestricted variety of office work spontaneously satisfies the common understanding of what is local business and makes the employees of such a building engaged in local business."

Since *Callus,* Congress has had ample opportunity legislatively to change that result if it so desired. It has not chosen to do so. Absent such action, it must be concluded that operation of an office building leased to a miscellany of tenants, *without more,* "satisfies the common understanding of what is local business and makes the employees of such a building engaged in local business." The cases cited by the Secretary are inapposite, there being no interstate business or transactions.

■ Nor can it be contended successfully that the mere fact of mailing reports to out-of-state stockholders and officers places the enterprise in commerce or in the production of goods for commerce. Mere use of the mails incident to a purely local business does not constitute engaging in commerce or in production of goods for commerce.[8]

The Third Circuit quoting the District Court's analysis with approval noted,[9]

"'* * * The records, reports * * * have no value of their own. They are not Defendant's objective and Defendant does not sell them as goods. Their preparation and transmission incident to a business whose purpose

does not comprise the production of goods at all, do not constitute engaging in the production of "goods." * * *

"'The Defendant's employees who prepare and transmit such records, reports and service contracts are not engaged in the production of goods for commerce within the meaning of the Act. * * * *'"

In light of the fundamentals enunciated in *Callus,* that operation of an office building, as here, constitutes local business, we cannot conclude that the activities of the office employees in transmitting reports across State lines constitutes their or defendant's, being engaged in commerce or in production of goods for commerce. Accordingly, we hold that the office employees do not meet the individual coverage requirements of the Act.

## II. Maids, Porters, Engineers, and Parking Lot Attendants

■ The Secretary contends that work of the maids, porters, engineers and parking lot attendants makes them "employees handling, selling, or otherwise working on goods that have been moved in commerce" and thus they are covered by the Act. This contention primarily is based on these employees' use of products which were produced outside the state and employed in performance of their respective duties. We cannot accept such a strained interpretation of the Act.

"'Goods' means goods * * * wares, products, commodities, merchandise, or articles * * * *but does not include goods after their delivery into the ac-*

7. 325 U.S. 578, 583, 65 S.Ct. 1227, 1229 (1945); See also Tobin v. Girard Properties, Inc., 206 F.2d 524 (5th Cir. 1953); Johnson v. Dallas Downtown Development Co., 132 F.2d 287 (5th Cir. 1942).

8. *Cf.* Stevens v. Welcome Wagon International, Inc., 390 F.2d 75 (3d Cir. 1968); Billeaudeau v. Temple Associates, Inc., 213 F.2d 707 (5th Cir. 1954). In Wirtz v. Sherman Enterprises, Inc., 229 F.Supp. 746, 752 (D.C.), the Court concluded:

"* * * The cases seem clear that the mere use of the mails in sending reports across state lines is not necessarily engaging in commerce within the meaning of the Act. Rather, it is only where the interstate communication is a material part of an interstate business that such activity constitutes engaging in commerce and renders the person performing it subject to coverage under the Act. * * * *"

9. Stevens v. Welcome Wagon International, Inc., *supra,* 390 F.2d 77.

*tual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof.*" (Emphasis added.)[10]

Clearly, Travis-Edwards is neither a producer, manufacturer, or processor.

The Secretary argues that the 1966 amendments to the Act extended coverage to the above captioned employees. That clearly strained interpretation of legislative intent is not supported.[11] This legislative history does not support such a revolutionary interpretation. We think the rearrangement in phrasing of the section probably was more of an attempt to correct unartful draftsmanship, in light of the several amendments, rather than to create an entirely *new theory* of coverage.

The Secretary's own interpretation of the Act disposes of his contention with respect to the maids, porters, and engineers here:

"* * * the term 'handling or in any other manner working on * * * goods' has been contained in the definition of the term 'produced' in section 3(j) of the Act since 1938, and *already has a well-defined meaning within the context of existing law * * *.*" 29 C.F.R. 779.240(b) (Emphasis added).

"In general, the term 'handling * * * or otherwise working on goods' includes employees who sort, screen, grade, store, pack, label, address, transport, deliver, print, type, or otherwise handle or work on goods." 29 C.F.R. 779.240(b).

"* * * An employee will be considered engaged in 'handling * * * or otherwise working on goods,' within the meaning of section 3(s), only if he performs the described *activities on goods* that have been moved in or produced for commerce by any person."

29 C.F.R. 779.240(b) (Emphasis added).

"* * * the mere fact that employees in conducting the business of the enterprise or establishment, are using machinery, equipment, work tools, and the like, which may have been moved in or produced for commerce, does not mean that they are handling, selling or otherwise working on 'goods' that have been moved in or produced for commerce within the meaning of section 3(s)." 29 C.F.R. 779.240(a).

It seems clear that coverage of the Act does not extend to a maid or porter who uses wax, etc., in his duties, an engineer who uses screws, etc., or an attendant who parks automobiles,[12] merely because the items were produced outside the State. The Act does not contemplate such tenuous connections with the use of out-of-state products in extending coverage, and the Amendments do not contemplate such a strained interpretation of "in commerce" or "production of goods for commerce." Such an interpretation is more akin to the "affecting commerce" coverage which was rejected.[13] Accordingly, we reject the Secretary's argument that the maids, porters, engineers, and parking lot attendants are "handling, selling or otherwise working on *goods* that have been moved in or produced for commerce by any person."

### III. Maid-Elevator Operator

█ The Secretary argues that because one maid has as part of her duties operation of an elevator when it is used to transport deliverymen with large deliveries that she is engaged in commerce. Again, the Secretary's contention must be rejected as urging too tenuous a con-

---

10. 29 U.S.C. § 203(i).

11. The Secretary relies heavily on statements by opponents to passage of the Act as to the scope of its coverage. We think these statements do not reflect legislative intent.

12. *See* Shultz v. Wilson Bldg. Inc., 19 W.H. Cases 130, 60 L.C. Para. 32.218 (D.C.Tex.1969).

13. See also text at n. 14, *infra.*

nection with commerce or the production of goods for commerce to come within the scope of the Act.

The Fifth Circuit Court of Appeals noted,[14]

"* * * we do not think that Congress intended that the Act with respect to those who are only 'engaged in commerce' should be stretched and strained to cover every person whose labor is of use or convenience or whose labor in some fashion contributes to the comfort or convenience of one who is so engaged. * * * Clearly, Congress intended the coverage of the Act to stop somewhere, and the line bounding coverage must be drawn somewhere."

We do not think the maid-sometime-elevator operator is engaged in commerce within the meaning of the Act.[15]

### IV. *Concession Stand Employees*

██ It is clear that the activities of the concession stand employees are of the type of activity contemplated within the "handling" language of the Act. However, the question then becomes whether operation of the concession stand is part of an "enterprise" as contemplated by the Act.

"(r) 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a *common business purpose*, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor: *Provided,* That, within the meaning of this subsection, a retail or service establishment which is under independent ownership shall not be deemed to be so operated or controlled as to be other than a separate and distinct enterprise * * * by reason of the fact that it occupies premises leased to it by a person who also leases premises to other retail or service establishments. * * *" 29 U.S.C. § 203(r). (Emphasis added.)

With respect to activities which are not related and are not performed for a common business purpose, the Secretary has stated:

"Activities which are not related even if performed by the same employer are not included as a part of the enterprise. The receipts from the unrelated activities will not be counted toward the annual dollar volume of sales and the *employees performing such unrelated activities will not be covered merely because they work for the same employer. Common ownership standing alone does not bring unrelated activities within the scope of the same enterprise.* If, for example, one individual owns or controls a bank, a filling station, and a factory, the mere fact of common ownership will not make them one enterprise. Activities which are not 'related' will be treated separately for purposes of the tests contained in section 3(s) (1) through (5) of the Act. For example, in the cases where a single company operates retail grocery stores and also engages in an unrelated business of manufacturing clothing, the 'enterprise' for purposes of section 3(s) (1) of the Act will consist of the retail grocery stores and any activities related to them. The clothing manufacturing will not be included in determining whether the retail business enterprise has one million dollars in sales and meets the other conditions of section 3(s) (1), and the factory employees will not be covered merely be-

---

14. Johnson v. Dallas Downtown Development Co., *supra*, 132 F.2d at 289–290.

15. See Houchin v. Thompson, 2 CCH W.H. Cases, Para. 32,377 (1970), aff'd 6th Cir. No. 20158, Aug. 26, 1970, distinguishing Wirtz v. Columbian Mutual Life Ins. Co., 246 F.Supp. 198 (W.D.Tenn.1965). We think the *Houchin* rationale is applicable under the instant facts.

cause the retail business is covered. The manufacturing business will be considered separately under section 3 (s)(3)." (Emphasis supplied.) 29 C.F.R. 779.211.

While the question is not totally free from doubt, we do not believe that operation of a concession stand and an office building are related activities. Because they are in the same physical confines does not make them so related, nor does the common profit motive.[16] To find that the maids, porters, engineers, parking lot attendants and office employees, which, as discussed above, do not meet the criteria for coverage in themselves, should be covered simply because Travis-Edwards also operated a concession stand is to place a strained interpretation on the Act which we think is unwarranted.

Accordingly, we hold upon the facts stipulated, that Travis-Edwards, Inc., is not an enterprise within the coverage of the Fair Labor Standards Act.[17]

The Secretary's prayer for relief is denied. A proper decree should be presented.

---

16. *Cf.* Wirtz v. Columbian Mutual Life Ins. Co., *supra*, at 207.

17. "On the terms in which Congress drew the legislation we cannot escape the duty of drawing lines. And when lines have to be drawn they are bound to appear arbitrary when judged solely by bordering cases." 10 East 40th Street Building, Inc. v. Callus, 325 U.S. at 584, 65 S.Ct. at 1230.