PILOT FREIGHT CARRIERS, INC. v. EDWARD SCHEIDT, COMMISSIONER OF MOTOR VEHICLES FOR THE STATE OF NORTH CAROLINA (CASE NO. T. D. 9144).

AND

PILOT FREIGHT CARRIERS, INC. v. EDWARD SCHEIDT, COMMISSIONER OF MOTOR VEHICLES FOR THE STATE OF NORTH CAROLINA (CASE NO. T. D. 12098).

(Filed 24 February, 1965.)

**1. Taxation § 26—**

The contract between a carrier and the labor unions representing its employees, differentiating for the purpose of computing the drivers' rate of pay between a "peddle run" and a "pickup and delivery" shipment, is not binding upon the State in ascertaining the tax due by the carrier to the State for the use of the State highways. G.S. 20-88(e).

**2. Same—**

In ascertaining that portion of an interstate carrier's revenue derived from the transportation of goods on the highways of this State, the total mileage within the State must be computed on the basis of the place where the carrier takes possession of the goods for shipment and the place where the carrier surrenders possession to the consignee, regardless of whether such points are at terminals or on "peddle runs" or "pickup and delivery" points.

APPEAL by defendant from *McConnell, J.,* May 25, 1964 Civil Session of FORSYTH, docketed and argued as No. 393 at Fall Term 1964.

Plaintiff, a common carrier of property by motor vehicle, computed and paid, based on its computation, the taxes chargeable to it by G.S. 20-88(e) for the years 1959 and 1960. After an audit of plaintiff's returns, the State assessed additional taxes for each year. The taxes so assessed were paid under protest. Demand for refund was refused. Plaintiff then instituted these actions, as permitted by G.S. 20-91.1, to recover the taxes alleged by plaintiff to have been illegally assessed.

The cases were consolidated for trial. Jury Trials were waived. The court found facts. On the facts found, judgment was rendered in favor of plaintiff for the sums claimed. Defendant excepted and appealed.

*Attorney General Bruton, Assistant Attorney General Brady, Allen, Steed & Pullen for defendant appellant.*

*Womble, Carlyle, Sandridge & Rice by Leon L. Rice, Jr. and Wade M. Gallant, Jr., for plaintiff appellee.*

RODMAN, J. The construction and maintenance of our highways is financed, in part, by a tax based on the use of the highways by motor vehicles, G.S. 20-97. The amount of the tax varies with the type of vehicle, its weight and intended use. Compare G.S. 20-87 and G.S. 20-88.

All motor vehicles using the highways of the State are required to register and pay an annual license fee, G.S. 20-50. The fee payable by motor carriers, except common carriers, is based on a variable rate per hundred pounds of gross weight, G.S. 20-88(b). Common carriers pay a fixed rate per hundred pounds of weight, irrespective of the size of the vehicle engaged in commerce. The sums paid by common carriers for licenses are only a prepayment on the amount owing for the use of our highways. They are charged six per cent of the revenues earned in the use of our highways, G.S. 20-88(e).

Where a carrier is engaged exclusively in intrastate commerce, the rule for measuring the tax is simple. The amount owing is six per cent of revenues. Plaintiff does both an intrastate and an interstate business. It operates in twelve states. North Carolina cannot take six per cent of the revenues derived from the movement of goods in interstate commerce; but it can require plaintiff and other interstate carriers to pay their fair portion of the cost of maintaining our highway system. *Transportation Co. v. Currie, Comr. of Revenue*, 248 N.C. 560, 104 S.E. 2d 403; *Crowder v. Commonwealth*, 87 S.E. 2d 745. What is the measuring rod which fixes the portion of interstate revenues subject to the six per cent tax? Our statutes, properly interpreted, furnish the answer.

The Legislature of 1937 fixed the basic rule to ascertain the amount carriers should pay for the use of our highways in moving goods in interstate commerce. The rule then adopted, with amendments applicable to these cases, is now codified as G.S. 20-88(e). So far as here pertinent, it provides:

"* * * Common carriers of property operating between a point or points within this State and a point or points without this State shall be liable for a six per cent tax only on that proportion of the gross revenue earned between terminals in this State and terminals outside this State that the mileage in North Carolina bears to the total mileage between the respective terminals. Common carriers of property operating through this State from a point or points outside this State to a point or points outside this State shall be liable for a six per cent tax on that proportion of the gross revenue earned between such terminals as the mileage in North Carolina bears to the total mileage between the respective terminals. * * * Common carriers of property operating from a point in this State to a point in another state over two or more routes, shall compute their mileage from the point of origin to the point of destination on the basis of the average mileage of all routes used by them from the point in this State to the point outside of this State and this figure shall be used as the mileage between said points in

determining the percentage of miles operated in North Carolina between said points."

The reference to "terminals" was inserted in 1943 (c. 648 S.L. 1943). Similar language was, at the same session, inserted in G.S. 20-87(a) relating to common carriers of passengers. The last sentence in the quoted portion of the statute was added in 1951 (c. 583 S.L. 1951).

When an interstate carrier receives property for transportation, it is required to issue a receipt or bill of lading, 49 U.S.C.A. § 20(11). The bill of lading must show the name of the consignor, point of origin (the place where the goods begin their journey), the kind and quantity of goods to be moved, the destination or journey's end and the name of the consignee, Title 49, Code of Federal Regulations, Part 172.1.

Many factors enter into the cost of transporting goods from one point to another. Some of the factors which must be considered are: What kind of goods are to be shipped; what quantity is to be shipped at one time; where do the goods start on their journey; to what point are they to be carried; what is the most feasible method of moving a shipment from point of origin to point of destination; what is a fair charge for moving the shipment from one point to another.

Carrier experience has demonstrated: A single shipment large enough to require the entire cargo space of a vehicle (truck load) can be moved from one point to another point at less expense than several small shipments moving from several points in the same general area to the same destination or to several destinations in the same general area. For this reason, truck load shipments normally carry a lower rate than LTC (less truck load).

Orderly and economical transportation of many relatively small shipments necessitates the establishment of a warehouse, at some convenient point or points, where different shipments destined for the same terminal point can be assembled and loaded in one vehicle. These assembly points are in carrier terminology known as "terminals." Plaintiff's terminals in this State are located at Winston-Salem, Durham, Wilmington, Laurinburg, Charlotte, Hickory and Asheville.

In the earlier days of our transportation system when goods moved principally by water or rail, the shipper normally made delivery to the carrier at its place of business, and consignee picked up the goods at the end of carrier's line.

The introduction of the motor vehicle as a common carrier, with its increased mobility, brought additional service. Now it is customary for motor carriers to go to consignor's place of business for the goods to be shipped, and to deliver the shipment to the consignee's place of business. This service appropriately became known as "pickup and de-

livery." Originally it was confined to the city in which the shipment originated or terminated. Increasing popularity led to its extension to the metropolitan area served by the assembly warehouse. The area covered by pickup and delivery service, according to the testimony in this case, varies materially from locality to locality. Plaintiff's evidence indicates that ten miles, or thereabouts, is the maximum limit of pickup and delivery service for North Carolina assembly warehouses. On the other hand, pickup and delivery service for New York includes all of the State of New Jersey, and a large part of the State of New York.

The relatively small pickup and delivery area served by North Carolina warehouses, or terminals, is too small to fit the needs of motor carriers in assembling goods to make up truck load shipments. For that reason, the carriers have expanded the areas around their warehouses beyond the areas technically described as "pickup and delivery." Carriers call for and deliver shipments in this outer area, without additional charge, just as they do in "pickup and delivery." These outer areas are called "peddle runs." "Line haul," "pickup and delivery," and "peddle run" are trade terms. Each has a clearly defined meaning recognized by common carriers, the Interstate Commerce Commission and our Utilities Commission.

Whether a particular shipment is a "peddle run" or a "pickup and delivery" is determined by contracts which motor carriers make with labor unions representing their employees. The name given a movement determines the driver's rate of pay. The State does not participate in nor is it bound by such contracts.

The amount which plaintiff has been required to pay has been computed by excluding the miles traveled in "pickup and delivery," but including miles traveled in "peddle runs." Plaintiff takes the position that neither "pickup and delivery" nor "peddle run" mileage should be used in determining North Carolina's proportion of the mileage "between the respective terminals." Plaintiff argues it has, because of economic pressure exerted by the labor union, been forced into a disadvantageous position, and that the Legislature, recognizing plaintiff's inability to negotiate an economically sound contract with the union, permitted plaintiff to compute mileage between "terminals."

We do not agree with the reasoning on which plaintiff seeks to recover. In our opinion, the word "terminal," as used in the statute, G.S. 20-88(e), means the point of origin or place where the carrier took possession of the shipment, or the point to which the transportation company makes delivery, the final destination of the shipment. *Great Northern Ry. Co. v. Commodity Credit Corp.*, 77 Fed. Supp. 780(787). The last sentence of the quoted portion of the statute reads: "Common

carriers of property operating from a point in this State to a point in another state over two or more routes, shall compute their mileage *from the point of origin to the point of destination* on the basis of the average mileage of all routes used by them from the point in this State to the point outside of this State and this figure shall be used as the mileage between said points in determining the percentage of miles operated in North Carolina between said points." This language, inserted by c. 583, S.L. 1951, is too clear to require interpretation.

For several years, "mileage" was ascertained by reference to the truck's manifest, a summary of the information provided by reference to all of the bills of lading issued for goods moving by that vehicle. This method of computing mileage was, because too complicated, abandoned by plaintiff pursuant to an agreement with an auditor representing the State. Legislative enactments prescribing the method of computing a tax cannot so easily be set aside. If the statutory language is cumbersome and produces inequitable results, carriers are not forbidden relief. Their remedy is an appeal to the Legislature to enact more equitable formulae.

Until the Legislature prescribes some other rule for measurement, the tax must be computed by ascertaining the miles actually traveled by outbound shipments from the place where the carrier takes possession of the shipment, the point of origin, to the State line; and for inbound shipments, the miles actually traveled from the State line to the place where the carrier surrenders possession of the shipment to the consignee, the point of destination. The miles the shipment actually moves in this State is the numerator. The total miles actually traveled by the shipment from the point of origin to the point of destination is the denominator. That fraction determines the portion of the revenue derived from each shipment which is subject to North Carolina's six per cent tax.

The conclusion here reached necessitates a new trial. Plaintiff is entitled to recover the amount over-assessed, if any, under the interpretation here placed on the statute.

New trial.