353 F.Supp. 1363 (1973)
James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,
v.
HYATT REALTY AND INVESTMENT COMPANY, INC., a corporation, and Chestley Julian Hyatt, Individually, Defendants, North Carolina Department of Motor Vehicles, Party Defendant.
James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,
v.
Garvis W. HAMILTON and Mrs. Garvis W. Hamilton, Individually, and trading and doing business as N. C. Motor Vehicle License Agency, Defendants, North Carolina Department of Motor Vehicles, Party Defendant.
Nos. C-139-WS-71, C-140-S-71.
United States District Court, M. D. North Carolina, Winston-Salem and Salisbury Divisions.
January 30, 1973.
*1364 *1365 Beverley R. Worrell, Dept. of Labor, Atlanta, Ga., for plaintiff.
James W. Armentrout, Winston-Salem, N. C., for Hyatt Realty and Chestley Julian Hyatt.
Benjamin D. McCubbins, Salisbury, N. C., for Garvis W. Hamilton and wife.
William W. Melvin, William B. Ray, Asst. Attys. Gen., Raleigh, N. C., for N. C. Dept. of Motor Vehicles.

MEMORANDUM OPINION
HIRAM H. WARD, District Judge.
The Secretary of Labor (Secretary) instituted these actions, pursuant to the Fair Labor Standards Act (Act), 29 U. S.C. § 201 et seq., seeking to enjoin defendants from violating the minimum wage, overtime and recordkeeping provisions of the Act, and to restrain them from withholding back wages owed to their employees. Defendant Hyatt Realty and Investment Company, Inc., (C-139-WS-71), and the defendants Hamiltons, d/b/a N. C. Motor Vehicle License Agency, (C-140-S-71), operate the business of issuing license plates for the State of North Carolina in the Counties of Forsyth and Rowan, respectively. The North Carolina Department of Motor Vehicles (Department) petitioned and was permitted to intervene as a party defendant.
By agreement of the parties, the cases were consolidated and it was stipulated that the issues of individual coverage (whether the employees are engaged in commerce or in the production of goods for commerce) and enterprise coverage (whether the employees are employed by an enterprise engaged in commerce or the production of goods for commerce), being common to all of the parties and the only issues in which the State defendant has any interest, should first be heard and determined by the Court.
The original defendants, during the times herein complained of, were parties to commission contracts with the Department for the issuance of registration (license) plates and registration cards under the provision of N.C.G.S. § 20-63(h). Prior to July 1, 1971, the commission paid by the State was 27¢ per plate and since that date, 30¢ per plate. The total monies collected by the defendants were deposited by them each day to the account of the Treasurer of North Carolina in a local bank designated by him. At the end of each month, the State sent to the defendants their respective checks for the past month's *1366 commissions. The monies collected by the defendants were compensatory taxes for the use and privileges of the public highways of the State. The State Treasurer credited the monies to the highway fund (N.C.G.S. 20-97) with the exception of one dollar for each vehicle, which was credited to the account of the State Board of Education Driver Training and Safety Education (N.C.G.S. 20-88.1).
The State of North Carolina issues some three and one-half million (3,500,000) license plates annually, all of which are manufactured within the State by the North Carolina Department of Corrections. Registration plates and registration certificates are issued at the Department's place of business in Raleigh and at the ninety-seven places of business located at various places over the State through the commission contractors, two of whom are the original defendants here.
The commission contractors furnish their own facilities and hire their own employees. The Department supplies the registration plates and necessary forms for use by the commission contractor, together with instructions as to procedure for completion of any and all forms involved, and bookkeeping and reporting requirements. In general, duties of the defendants, as commission contractors (sometimes referred to as license agencies), involve the issuance of registration plates for four (4) different categories of vehiclesrenewal, new vehicles, transfers from another state, and transfer of ownership by residents. The activities performed at the license agencies, in issuing plates, are as follows:
(a) RENEWALS: In Decenber of each year the Department mails a renewal card to the registered owner[1] of each vehicle. This card consists of two partsan application and a registration certificate. The owner must complete the required liability insurance information on the reverse side of the application and sign his name certifying that such information is correct. He then presents the card to the license agency and pays the required tax. If the employee of the commission contractor finds that the application card is properly completed and executed, he stamps the license plate number on both the application and certificate. He gives the license plate and registration certificate to the owner and retains the application part of the card. The license agency daily deposits all tax monies collected in a local bank account in the name of the Treasurer of North Carolina. The agency compiles a list of names and addresses matching the license plate issued to each vehicle. It forwards to the Department each day this list, application cards, and duplicate deposit slip for the day's receipts.
(b) NEW VEHICLE PURCHASES: The purchaser of a new vehicle can obtain a license plate from the commission contractor.[2] In that case, he must fill out and submit a manufacturer's certificate of origin assigned to him, an application for title (MVR-1 form), and proof of insurance coverage. Upon payment *1367 of the tax, he receives a license plate and a temporary registration card which has his license plate number stamped on it. The license agency includes the transaction on its daily report list and sends it and the certificate of origin, application for title and proof of insurance to the Department. The Department issues the title to the proper person (see footnote 1) and also mails the registration card to the owner. This card replaces the temporary one issued by the agency.
(c) TRANSFER OF REGISTRATION TO NORTH CAROLINA FROM ANOTHER STATE: The owner presents his out-of-state title, application for North Carolina title, and proof of insurance to the agency. Upon payment of the appropriate tax, he receives a license plate and a temporary registration card which has his license number stamped on it. The agency includes the transaction in its daily report list and sends it and the out-of-state title, application for title and proof of insurance to the Department. The Department issues the title to the proper person and also mails the registration card to the owner. In addition, the Department mails the out-of-state title to the issuing state for cancellation.
(d) TRANSFERS BY RESIDENTS: When a vehicle registered in North Carolina is sold by the owner to another North Carolina resident, the seller completes a bill of sale section on the certificate of title; the new owner completes another section applying for a new title and certifies that liability insurance is in effect. The agency then follows the procedure described above, and finally the Department issues a new title and registration certificate to the proper persons.
In all of the above-described transactions, if the vehicle is subject to a lien, the Department records the lien on the title and mails the title to the lienholder rather than the owner. Some of the lienholders are located outside the State of North Carolina.
No motor vehicles are manufactured in North Carolina. Consequently, all manufacturers' certificates of origin move across state lines before reaching the ultimate North Carolina owner.
In some instances, such as the issuance of special plates of a personalized nature (N.C.G.S. § 20-81.3), only the Department handles the transaction.
It is stipulated that approximately eighty per cent of all renewal license plates are issued by commission contractors. Total money collected by the defendant Hamiltons during the calendar years 1969, 1970 and 1971 exceeded $500,000. Money collected by the defendant Hyatt Realty and Investment Company, Inc., exceeded $1,000,000 during 1969 and 1970. Neither defendant received as much as $250,000 commission for any yearly period. Hyatt has not been a commission contractor since February 18, 1971.
The licensing materials obtained directly by the Department and those sent to the Department by the commission contractors become part of a permanent record. The information is also stored in a computer. Thus, a complete list of all vehicles registered, the owner's name and address, and the license plate number is compiled and maintained by the Department. These records are open to the public. (N.C.G.S. § 20-43). At one time, the Department permitted the public to come in and personally inspect the records. Due to the increase in volume of the records it is physically impossible to allow personal inspection, so the Department now furnishes the requested information and charges the inquirer its costs in providing the service. Public agencies, such as law enforcement agencies, can receive the information without charge.
At least one out-of-state company each year obtains a complete list of motor vehicle registrations in North Carolina from which it prepares statistical data such as city-by-city and county-by-county analysis of the type, make and model *1368 of all vehicles registered. Other out-of-state firms purchase lists for use as a mailing list. Information is supplied to out-of-state law enforcement agencies upon request.
The Department makes a random check of the owners' claims as to their having liability insurance covering their vehicle. The information supplied by the owner is sent to the home office of the insurance company along with a request to verify the veracity thereof. Some of the owners' insurance companies have home offices outside the State of North Carolina.
All vehicles operating on the public roads, streets or highways must have a valid registration plate properly attached. Title to all registration plates remains in the State of North Carolina (N.C.G.S. § 20-63(a) & (b)). It is readily conceded that at least some of the vehicles for which license plates are issued by the original defendants move between points within and without the State of North Carolina.
The Secretary raises two main issues for this Court to decide at this time. First, he asks whether the commission contractors' employees were "engaged in commerce" or "in the production of goods for commerce" as defined in the Act. Next, he questions whether the employees' activities bring the defendants' businesses under the "enterprise" coverage of the Act, in that the employees' issuing license plates and collecting taxes meets the "gross volume of sales" requirement (29 U.S.C. § 203(s)) contained in either or both the 1961 or 1966 amendments to the Act. The Court answers both questions in the negative.
The parties advise the Court that this is a case of first impression. Therefore, a few prefatory comments may be in order.
Since the Court feels the instant case falls under the shadow of Mitchell v. Zachry Co., 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753 (1960), some discussion of that case may serve to illuminate the path this Court will follow. There the Supreme Court emphasized that the limits to coverage under the Act could not be expressed solely by referral to the social purpose of the Act. The Act manifests Congress' concern not to impinge upon matters of local interest. Congress did not imbue the Act with its full power under the Commerce Clause. As the Supreme Court said in Mitchell v. Zachry Co., supra, 362 U.S. at p. 316, 80 S.Ct. at p. 743, 4 L.Ed.2d at p. 759:
For the Act also manifests the competing concern of Congress to avoid undue displacement of state regulation of activities of a dominantly local character. Accommodation of these interests was sought by the device of confinement of coverage to employment in activities of traditionally national concern. The focus of coverage became "commerce," not in the broadest constitutional sense, but in the limited sense of § 3(b) of the statute: . . . (Emphasis added).
The Court also accentuated the need to resort to practical considerations in construing the Act. This arises, the Court said, because:
As early as A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, we recognized that the penetrating and elusive duty which this Act casts upon the courts to define in particular cases the less-than-constitutional reach of its scope, cannot be adequately discharged by talismanic or abstract tests, embodied in tags or formulas. (362 U.S. at p. 313, 80 S.Ct. at p. 742, 4 L.Ed.2d at p. 758).
The pragmatic approach must be adopted here because this is a case of first impression, but perhaps more important, the very nature of the case precludes the notion that hard problems can be made to fit simple forms.
In the instant case, the defendants are commission contractors for the collection of a state tax. This aspect of the case has an importance which cannot be ignored. Thus it may well be that if the commission contractors performed another *1369 function for the State, this variance would portend an opposite result in this Court's decision.
The power to lay and collect taxes has been said to be an attribute of sovereignty. Thus the Supreme Court in Bode v. Barrett, 344 U.S. 583, 585, 73 S.Ct. 468, 470, 97 L.Ed. 567, 571 (1953), sustained the constitutionality of an Illinois motor vehicle tax (similar to the here-involved tax) as not infringing upon the Commerce Clause (Article I, Section 8) of the Constitution, and made the following comment about the taxing power of a state:
The power of a state to tax, basic to its sovereignty, is limited only if in substance and effect it is the exertion of a different and a forbidden power (A. Magnano Co. v. Hamilton, 292 U. S. 40, 44, 54 S.Ct. 599 [601], 78 L.Ed. 1109, 1114, as for example the taxation of a privilege protected by the First Amendment.
In Dameron v. Brodhead, 345 U.S. 322, 327-329, 73 S.Ct. 721, 97 L.Ed. 1041, 1046-1047 (1953), where the Supreme Court upheld the constitutionality of a federal statute exempting servicemen from certain types of state taxation, Justices Douglas and Black, in dissenting, issued the following warning:
The power to tax is basic to the sovereignty of the states. Union P.R. Co. v. Peniston (US) 18 Wall 5, 21 L.Ed. 787. There are few express restrictions of that power contained in the Constitution. See Art. I, § 10; Richfield Oil Corp. v. State Board of Equalization, 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80; Canton R. Co. v. Rogan, 340 U.S. 511, 71 S.Ct. 447, 451, 95 L.Ed. 488. And the implied restrictions are not numerous.
Justice Strong, in Union Pacific R. R. Co. v. Peniston, (U.S.) 18 Wall. 5, 21 L. Ed. 787, 791 (1873), characterized the taxing power of a state as:
one of its attributes of sovereignty; that it exists independently of the Constitution of the United States, and underived from that instrument; . . . except so far as it has been surrendered to the Federal Government, either expressly or by necessary implication, . . . we have declared that it is indispensable to their continued existence.
Naturally, the nature and degree of sovereignty reposing in a state is a question of no mean import. Cf. Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968). The Court in New York v. United States, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946), also faced the problem in a case involving the scope of Article I, Section 8 of the Constitution: "To lay and collect Taxes, Duties, Imposts and Excises . . . ."
The Court in New York v. United States, supra, as the majority in Maryland v. Wirtz, supra, eschewed attaching great weight to a State's acting as a government or a State's acting as a businessman as a test of the reach of Congress' power. The reason given by the Court was "[t]o rest the federal taxing power on what is `normally' conducted by private enterprise in contradiction to the `usual' governmental functions is too shifting a basis for determining constitutional power and too entangled in expediency to serve as a dependable legal criterion." (326 U.S. at p. 580, 66 S.Ct. at p. 313, 90 L.Ed. at pp. 332-333). However, it went on to say:
Surely the power of Congress to lay taxes has impliedly no less a reach than the power of Congress to regulate commerce. There are, of course, State activities and State-owned property that partake of uniqueness from the point of view of intergovernmental relations. These inherently constitute a class by themselves. Only a State can own a Statehouse; only a State can get income by taxing. These could not be included for purposes of federal taxation in any abstract category of taxpayers without taxing the State as a State. (326 U. S. at p. 582, 66 S.Ct. at p. 314, 90 L. Ed. at pp. 333-334).
*1370 Thus, the Court in New York v. United States, supra, found a uniqueness in a State's taxing power which would prevent federal interference with that activity. This novelty concerning taxation may be that "sovereignty" of a state which Justice Strong talked about in Union Pacific R. R. Co. v. Peniston, supra.
These prefatory comments are not meant to indicate a decision on whether Congress could regulate state employees engaged in tax collection. Obviously, that issue us not before this Court. The Secretary does not proceed on behalf of State employees. The above exposition is meant to demonstrate this Court's view that state tax collection not only is an activity of local nature, but also is a unique operation in a constitutional sense.

I

WERE THE COMMISSION CONTRACTORS' EMPLOYEES "ENGAGED IN COMMERCE" OR "ENGAGED IN THE PRODUCTION OF GOODS FOR COMMERCE" AS DEFINED BY THE ACT?
In this section the Court examines the issue of traditional, individual employee coverage under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, et seq., as opposed to "enterprise" coverage under the 1961 and 1966 amendments to the Act. (This second issue is covered in Part II of this opinion.) The standards guiding courts in rendering decisions in Fair Labor Standards Act cases have been succinctly set out in Wirtz v. R. E. Lee Electric Company, 339 F.2d 686, 689 (4th Cir. 1964):
It is well recognized that Congress did not make the coverage of the Fair Labor Standards Act coextensive with its power to regulate commerce, but intended to leave local activity to state regulation. (citations omitted). However, three employee situations were clearly intended to be covered by the Act: Employees engaged in commerce, those engaged in the production of goods for commerce in a direct sense, and those engaged in any closely related process or occupation directly essential to the production of goods for commerce. (citations omitted). The Supreme Court has held that "* * * Congress deemed the activities of the individual employees, not those of the employer, the controlling factor in determining the proper application of the Act." Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207, 213, 79 S.Ct. 260, 265, 3 L. Ed.2d 243 (1959). This court has held: "The activities of the employee, not those of the employer, are decisive on the question of the Act's coverage and the decision is governed by practical considerations rather than technical conceptions." (See Wirtz v. Modern Trashmoval, Inc., 1963, 323 F.2d 451, at pages 456-457 [4th Cir.], and cases there cited.)
The Secretary has the burden of proof on the issue of whether the activities find coverage under the Act. Anderson v. Mt. Clemens Pottery Company, 328 U.S. 680, 686-687, 66 S.Ct. 1187, 90 L. Ed. 1515, 1522 (1946), Wirtz v. Durham Sandwich Company, 259 F.Supp. 710, 712 (M.D.N.C. 1965), aff'd 367 F.2d 810 (4th Cir. 1966).
In the instant case the Secretary concentrates his efforts on three types of employee duties which he says brings them within the Act. They are (1) the collection of taxes; (2) the transmission of intelligence; and (3) the issuance of license tags. The Secretary claims that these activities come within the Act in that they are of such a nature that the employees were (1) "engaged in commerce," (2) "engaged in the production of goods for commerce" in a direct sense, or (3) "engaged in a closely related process or occupation directly essential to the production of goods for commerce," as those terms are defined in the Act. In reviewing each of the three types of employee activity, the Court is mindful that the Act does not utilize the *1371 full extent of Congress' power under the Commerce Clause.
Collection of Taxes. The Secretary, relying upon Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959), claims that by collecting the taxes in this case, the commission contractors' employees were "engaged in commerce." Section 203(b), Title 29, U.S.C., defines "commerce" to mean "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." Here the employees did not cross state lines. The Secretary, however, says that since the tax money is used in road construction on state highways, the employees were "engaged in commerce." The Secretary makes an analogy between this case and Mitchell v. Lublin, McGaughy & Associates, supra. There the Supreme Court held that workers who helped in the preparation of plans and specifications for work on various interstate instrumentalities came within the coverage of the Act because without the plans and specifications the instrumentalities could not function or be constructed. The Secretary says that the collection of taxes is likewise necessary for the functioning of interstate instrumentalities, that is, state roads.
The Court concludes that the collection of taxes does not signify that a worker is "engaged in commerce." In the present case, not all of the tax money collected is credited to the State Highway Fund. Some of it goes to the driver education fund. Not all of the road use tax is collected by the commission contractors because some license plates are distributed directly by the State. While the statute (N.C.G.S. § 20-97) says that the money will be credited to the State Highway Fund, the Secretary has submitted no proof that any of the money was used for the construction or maintenance of highways, as opposed to other projects on which the Department may spend the money.
The Court concludes that the employees here do not come under the test set out in Mitchell v. Lublin, McGaughy & Associates, supra, 358 U.S. at p. 212, 79 S.Ct. at p. 264, 3 L.Ed.2d at p. 247:
The test is "whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity."
There is no evidence that the license tax constitutes the only money available to the Highway Fund for construction and maintenance of state highways. To the contrary, N.C.G.S. § 105-434 provides for a 9¢ per gallon tax on gasoline. Those tax monies are disbursed on vouchers drawn by the State Highway Commission pursuant to N.C.G.S. § 105-445. It cannot be said that the tax money collected by the commission contractors is directly and vitally related to the functioning of North Carolina highways. Undoubtedly, the tax could be collected without the defendants, as was done in the past before subsection (h) was added to N.C.G.S. § 20-63 in 1961. It appears to this Court that N.C.G.S. § 20-63(h) was intended to further the public convenience by setting up local license plate distribution points throughout the State, as well as eliminate the necessity of employing temporary Department personnel for a forty-five day period between January 1 and February 15 of each year when the vast bulk of the license plates are issued. The legislature did not intend to aid or facilitate the functioning of an interstate facility, in this case the state highways.
The Court rejects the Secretary's position for an additional reason. Here the defendants turn the tax money over to the Treasurer of North Carolina. In so doing, they perform a general tax collecting effort. The statutes do not earmark the funds for any specific project or road, and as stated previously, not all of the tax even goes to the Department. Coverage under the Act cannot depend upon the diverse uses to which the State *1372 puts the money. The fact that the State uses a particular tax for a certain purpose is purely fortuitous. The same result could be obtained by resort to the general funds of the state. The tax collecting here cannot be said to be "directly related to the end products" as the plans and specifications were to the specific projects in Mitchell v. Lublin, McGaughy & Associates, supra, 358 U.S. at p. 212, 79 S.Ct. at p. 264, 3 L.Ed.2d at p. 248. The tax money is too remote from, and lacks dedication to, an instrumentality of interstate commerce. Cf. Mitchell v. Zachry Co., supra. The Court concludes that the tax collection here is essentially a local activity which Congress did not intend to include under the Act.
Plaintiff does not contend in his brief that the collection of tax monies constitutes the "production of goods for commerce." This Court does not conclude otherwise. Collecting tax money, without more, does not mean the employees are engaged in the production of goods. Tax money is not a good under the Act. Using the most general term in the definition of "goods," tax monies are not "articles or subjects of commerce" (29 U.S.C. § 203(i)). They are a quantity derived from a power unique to the State. As such, they are the product of a very local, intrastate activity.
Transmission of Intelligence. The Secretary next contends that the employees' preparing and handling of registration lists, registration applications which contain insurance certification, other insurance certification forms, title applications, out-of-state titles, and manufacturers' certificates of origin, and their sending them to the Department constitute engaging in the production of goods for commerce. Some of these items experience interstate movement. When a person buys a car in North Carolina and receives a manufacturer's certificate of origin assigned to him, the certificate has to move across state lines since there are no vehicle manufacturers located in the State. The out-of-state title sent back to the issuing state moves across state boundaries. The information contained in the insurance certifications may move across state lines, as does the information contained on the registration applications and registration lists.
All these items are already filled out by the owner of the vehicle when he comes to the license agency. The only work that an employee performs on them is the stamping of the license number on the registration card and application, and the compiling of a list of the transactions. The defendants testified before this Court that while they do give local law enforcement agencies a copy of the lists they make, and that the lists are open to inspection by the public, they do not send the lists out-of-state.
The Secretary, in his brief, apparently does not contend that the employees' activities bring them within the meaning of having "engaged in commerce." The Court agrees.[3] It has not found any *1373 regular use of the channels of interstate commerce by defendants' employees. Nor is there evidence that the employees formed an essential link in handling either communications or goods flowing in "commerce."
Likewise, the Court holds that these activities do not amount to engaging in "the production of goods for commerce" or in "any closely related process or occupation directly essential to the production" of goods for commerce, as those terms are defined by the Act. The Secretary argues that the transmission across state lines of manufacturer's certificates of origin, motor vehicle titles, registration lists or the information on them, or the information from the owner's certification of insurance has a sufficiently close nexus to the duties of the employees in the license agencies to bring them under the Act. He relies upon Western Union Teleg. Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414 (1945), for the propositions that ideas, wishes, orders and intelligence are subjects of commerce within the Act's definition of "goods," and that "produced" includes "every kind of incidental operation preparatory to putting goods into the stream of commerce." (323 U.S. at p. 503, 65 S.Ct. at p. 342, 89 L.Ed. at p. 424). His theory evidently is that the employees' handling of the various items sufficiently supports their interstate movement so as to bring them under the Act.[4]
The Court's own research indicates that the concept of "goods" under the Act has been broadly interpreted. Shultz v. Merriman, 425 F.2d 228 (1st Cir. 1970), and Wirtz v. A. S. Giometti & Associates, Inc., 399 F.2d 738 (5th Cir. 1968)maps and plats; Allen v. Atlantic Realty Company, 384 F.2d 527 (5th Cir. 1967)management reports; Hodgson v. Rancourt, 336 F.Supp. 1119 (D.R.I. 1972)address labels. In fact, one court upheld a determination granting coverage for employees preparing maps and plats, initially sold to intrastate customers, but eventually finding their way across state lines. White v. Wirtz, 402 F.2d 145 (10th Cir. 1968). The trial court had held that the defendant knew, or it could be reasonably inferred that he had grounds to anticipate that his product would move in commerce. (272 F.Supp. 70, 72 (N.D.Okl. 1967)).
Those cases do not cover the instant factual situation. Even if it were conceded that the employees "produced goods," the Court still must find that they produced goods "for commerce." The employee activities here come closer to those in Shultz v. Travis-Edwards, Inc., 320 F.Supp. 834 (W.D.La. 1970). There the employees compiled facts and figures into reports and mailed them to out-of-state officers and stockholders. The Court determined that this did not constitute engaging in the production of goods for commerce. The Secretary cited numerous cases, including some that he relies upon in this case. (320 F. Supp. at p. 836, fn. 6). The Court replied:
Significantly, in each of the cited cases, the office employees were engaged in activities which were incidental to interstate business or interstate business transactions. (320 F. Supp. at p. 836)
It held that the mere use of the mails to transport material incidental to a local business or activity does not constitute engaging "in the production of goods for commerce," as defined by the Act.
*1374 The employees in the present case do not produce goods for commerce. The various items and information they handle is done pursuant to their duty to collect taxes. True, some of the items and information acquired may move interstate. However, such movement is incidental to the intrastate activity of tax collection, and not incidental to an interstate transaction. The scheme set up by the State to collect its taxes has primarily intrastate influence. Any interstate movement of the items or information does not constitute a necessary, material, or closely related part of a designed interstate transaction. Thus the employees here are not "engaged in the production of goods for commerce." (Cf. Shultz v. Travis-Edwards, Inc., supra; Stevens v. Welcome Wagon International, Inc., 390 F.2d 75 (3rd Cir. 1968); Billeaudeau v. Temple Associates, 213 F.2d 707 (5th Cir. 1954); Wirtz v. B. B. Saxon Company, 365 F.2d 457, 462 (5th Cir. 1966).
The employees' activities in this case are essentially local in nature. Perhaps that explains the difference in treatment of them compared to the employees in the cases relied upon by the Secretary. As pointed out in Mitchell v. Zachry Co., supra, 362 U.S. at p. 315, 80 S.Ct. at p. 743, 4 L.Ed.2d at p. 759, the disparity arises:
. . . since part of an enterprise which "spontaneously satisfies the common understanding of what is local business," was itself sufficiently different, despite identical employee duties, from prior cases to justify regarding it as separate from the "necessary parts of a commercial process" which are within the Act. These decisions and distinctions were not exercises in lexicography. No niceties in phrasing or formula of words could do service for judgment, could dispense with painstaking appraisal of all the variant elements in the different situations presented by successive cases in light of the purpose of Congress to limit coverage short of the exercise by it of its full power under the Commerce Clause.
There the employees worked on the construction of a dam that would impound water, some of which would go to out-of-state producers. In excluding the employees from coverage, the Court noted two significant factors to be considered. It said:
Bearing in mind the cautionary revision in 1949, and that the focal center of coverage is "commerce," the combination of the remoteness of this construction from production, and the absence of a dedication of the completed facilities either exclusively or primarily to production, persuades us that the activity is not "closely related" or "directly essential" to production for "commerce." (Id.)
In the instant case, the employees' collection of information has a similar relation to commerce, as the construction of the dam in Mitchell v. Zachry Co., supra. The employees' handling of the items and forms is incidental to their purpose of collecting the tax for the State. Certainly, the particular method adopted by the State, in this case, to collect its taxes cannot be said to be dedicated to the production of goods for commerce. The tax is local in nature.[5]
The activity is also remote from commerce or the production of goods for commerce. The employees merely follow state law. The nature of the operation shows a one way flow. The State sends applications to owners. The owners fill out the forms. The defendants' employees collect the tax and send the items and forms to the Department. *1375 The Department then makes any further contact with the owner. This activity is distinguishable from that in Powell v. United States Cartridge Co., 339 U.S. 497, 515, 70 S.Ct. 755, 94 L.Ed. 1017, 1036 (1950), where the Court said that it was immaterial whether the munitions were shipped in interstate commerce before or after delivery to the United States as the ultimate consumer. Here the items or information must move intrastate after the license agency collects the taxes. These agencies cannot operate in other states and from there transmit the taxes and information to the Department. The employees collect taxes on property having situs in North Carolina from persons in the State. The collection of the taxes and assembling of related materials, all of which is done to facilitate and further local, intrastate purposes, is too remote from any subsequent actions taken by the Department to connect the license agency employees with "commerce."
In the end "[w]hat is finally controlling in each case is the relationship of the employment to `commerce'." Mitchell v. Zachry Co., supra, 362 U.S. at p. 320, 80 S.Ct. at p. 746, 4 L.Ed.2d at p. 762. Here the activities concern tax collection. Any relation to "commerce" as defined in the Act is tenuous at best. Some of the material or information may travel interstate. However, as said in Mitchell v. Zachry Co., supra, 362 U. S. at p. 321, 80 S.Ct. at p. 746, 4 L.Ed.2d at p. 762:
It is a sufficient answer to this contention that the record is devoid of evidence of a purposeful and substantial dedication of otherwise local production [i. e. the construction of a dam for the public, here the collection of a state tax] to consumption by "commerce" which was the basis of our decision in Alstate.
Issuing of License Plates. The Secretary's final contention states that the defendants' employees come under the Act because they issue license plates to motor vehicles, some of which travel across state lines. The Secretary claims the license plate is a "good" and thus the employees engage "in the production of goods for commerce."
The North Carolina license plate has some peculiar qualities. It remains the property of the State and can be summarily seized under certain conditions. (N.C.G.S. § 20-63(a)). It has a quality like a receipt for the payment of a tax.
In any event, the Court finds that the plates are not issued in order that they may be taken out of the State. They are not issued to facilitate movement in interstate commerce. The plates are a receipt for the privilege of using North Carolina highways, thus any aid they give to commerce relates only to intrastate movements. Here, as in the preceding section, the Court holds that the main purpose of issuing the plate involves an essentially local activity or production. The issuance of the plate is remote from, and lacks dedication to commerce. Their subsequent involvement in interstate commerce is fortuitous, and unsubstantial in light of the purposes of the Act. Congress did not exercise its full power under the Commerce Clause in enacting the Act. It sought to avoid interference with operations local in nature. The activities of the employees in issuing license plates have that aura of parochial concern, so as to exclude their work from coverage under the Act.

II

DO DEFENDANTS' OPERATIONS COME UNDER THE ACT'S ENTERPRISE COVERAGE?
The Secretary's final argument is that the defendants' businesses constitute enterprises within the 1961 and 1966 amendments to the Act. The 1966 amendment was effective February 1, 1967. These actions were filed on June 28, 1971. The statute of limitations for enforcement of unpaid minimum wages or unpaid overtime compensation is two *1376 years, if the violation is not willful.[6] Thus the Court will only concern itself with the 1966 amendment, which in any event is broader in scope than the 1961 amendment. It provides in pertinent part (29 U.S.C. § 203(s)):
Section 3(s) "Enterprise engaged in commerce or in the production of goods for commerce" means an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which
(1) During the period February 1, 1967, through January 31, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level which are separately stated) or is a gasoline service establishment whose annual gross volume of sales is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated), and beginning February 1, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated); . . . (Emphasis added).
The addition of enterprise cover age in the 1961 and 1966 amendments created two significant changes in coverage of the Act. First, it extended the Act's "protection to the fellow employees of any employee who would have been protected by the original Act, . . . ." Maryland v. Wirtz, supra, 392 U.S. at p. 188, 88 S.Ct. at p. 2020, 20 L.Ed.2d at p. 1026. Since the Court has concluded that no individual employee comes under the traditional coverage of the Act, this expansion by the amendments does not affect the results of this case.
Secondly, the Act extended the enterprise coverage to include employees "handling, selling or otherwise working on goods that have been moved in or produced for commerce" (29 U.S.C. § 203(s)). This language has been interpreted to mean "the legislation was designed to regulate enterprises dealing in articles acquired intrastate after travel in interstate commerce . . . ." Wirtz v. Melos Construction Corporation, 408 F.2d 626, 628 (2nd Cir. 1969).
In expanding the Act to cover "handling, selling, or otherwise working on goods that have been moved in or produced for commerce," Congress sought to extend protection to employees handling materials that moved indirectly in commerce. Thus it intended to meet the situation where a business handles material that at one time moved in commerce, but was purchased from an intrastate supplier. Essentially, the change recognized that the use of the middleman or wholesaler was a common business practice. The amendments permit the tracing of movement from the manufacturer to the ultimate consumer. Thus it covers enterprises where the employees handle materials made available as a result of interstate movement at some time, but not where the enterprise uses the material as an ultimate consumer. Irby v. Davis, 311 F.Supp. 577 (E. D.Ark. 1970); Wirtz v. Mayer Construction Co., 291 F.Supp. 514 (D.N.J. 1968); Childress v. Earl Whitley Enterprises, Inc., 388 F.2d 742 (4th Cir. 1968).
Because of the unique nature of the defendants' businesses, the Court doubts that Congress intended the amendments would cover the fact situation in this case. Congress sought to regulate businesses which, because of their large dollar volume of transactions, would likely *1377 have a substantial effect on commerce, either directly or indirectly. The license agencies, acting in a surrogate capacity for the State as tax collector, for both the State's and the public's convenience, do not appear to have been within Congress' contemplation when it enacted the amendments.
Yet the Court does not have to wrestle with the problems of Congressional policy versus a literal reading of the amendments in order to decide the question of enterprise coverage. Assuming the activities come under the Act, the Secretary has failed to prove the defendants' businesses meet the dollar volume requirement of the Act.
At a minimum, the Secretary must show that the defendants had a gross volume of sales in excess of $250,000 (exclusive of excise taxes). The stipulations of the parties show that the total tax money collected each year by defendants Hamiltons in 1969, 1970 and 1971 exceeded $500,000, and that collected each year by defendant Hyatt Realty and Investment Company, Inc., exceeded $1,000,000 for 1969 and 1970. Neither defendants' gross commissions exceeded $250,000 for any one year. Thus the Secretary fails to prevail unless he convinces the Court that "gross volume of sales" means the total tax monies collected, rather than the gross commissions of the defendants.
The Secretary asks the Court to hold that the disposition of license plates by defendants amounts to a sale under the Act. In reference to enterprise coverage, "sale" is defined in 29 U.S.C. § 203(k) to include "any sale, exchange, . . . or other disposition." In adopting this position, the Secretary's claim is not without some merit.[7] However, defendants counter with persuasive argument. They say that the money collected is entirely a tax and thus excludable under the statute's language"exclusive of excise taxes at the retail level which are separately stated" (29 U.S.C. § 203(s)(1)). Hence defendants claim that even if the distribution of a license plate is a "sale," the transaction does not come under the Act. The monies collected from distributing the plates do not meet the required dollar amount, since the entire proceeds of the alleged sale, being a tax, is excluded from computation of the "gross volume of sales" (29 U.S.C. § 203(s)(1)). The Court finds merit to that argument.[8] Thus the Secretary has failed to show that the defendants' businesses had that dollar amount of sales to bring them under enterprise coverage of the Act.
Accordingly, the Court concludes that upon the facts and the law the defendants' employees do not come under the traditional coverage of the Act, and the *1378 defendants' businesses do not constitute an enterprise as defined by the Act.[9]
The Secretary's prayer for relief in each case is denied. Defendants will prepare and submit a judgment accordingly.
NOTES
[1] As it is used here, the term "owner" has a dual meaning. Here it can refer to the person who intends to use the vehicle in North Carolina, and thus must make application to register the vehicle in his name. This person may not be the legal owner of the vehicle because title to it may rest in one or more lienholders. In that case, the lienholder would have possession of the title to the vehicle, while the "owner" would have possession of the vehicle, license plate, and the registration certificate. This definition is similar to that in the Motor Vehicle Safety and Financial Responsibility Act (N.C.G.S. § 20-279.1), which requires the "owner" to maintain liability insurance coverage on the vehicle. (See Indiana Lumbermens Mutual Insurance Co. v. Parton, 147 F. Supp. 887 (M.D.N.C.1957); Nationwide Mutual Insurance Co. v. Hayes, 276 N.C. 620, 174 S.E.2d 511, 517 (1970).
[2] The purchaser of the new vehicle can also have the dealer secure a license plate for him. In that case, the dealer issues the owner a temporary plate, and also sends in the required forms to the Department, which issues a title, registration card, and license plate to the owner.
[3] Here, as in Wirtz v. Modern Trashmoval, Inc., 323 F.2d 451, 457 (4th Cir. 1963), cert. denied, 377 U.S. 925, 84 S.Ct. 1222, 12 L.Ed.2d 216 (1965), it can be said:

As none of Modern's employees either crosses state lines in connection with his employment, handles goods directly moving in the channels of interstate commerce, or directly contributes to the repair or extension of facilities of interstate commerce (see e. g., Mitchell v. C. W. Vollmer & Co., supra), it is clear that the use-plaintiffs were not "engaged in commerce" within the meaning of the Act.
Nor do the activities fit within summary in 48 Am.Jur.2d, Labor and Labor Relations, § 1576 (1970), as to "Employees involved in the movement of goods or things in commerce:"
Employees are engaged in commerce under the provisions of the Fair Labor Standards Act where they are engaged in industries directly involved with the movement of goods or things in interstate and foreign commerce, such as transportation and shipping, telephone and telegraph, and radio and television, as well as businesses which regularly use the channels of commerce in the course of their operations, such as newspaper publishing, and warehousing of goods that travel across state lines.
[4] He cites for support Public Building Authority of Birmingham v. Goldberg, 298 F. 2d 367 (5th Cir. 1962), where coverage was given to maintenance employees of a building owned by the State of Alabama, and used by federal government workers to send checks to other states. He also relies on Credit Service, Inc. v. Fleming, 372 F.2d 143 (5th Cir. 1967), which held that the compilation of credit reports, some of which were sent out-of-state, was the production of goods for commerce.
[5] Were the tax construed as a regulation of or tax on interstate commerce, it would be unconstitutional. Cf. Portland Cement Co. v. Minnesota, 358 U.S. 450, 458, 79 S.Ct. 357, 3 L.Ed.2d 421, 427 (1959). The instant tax does not have an unconstitutional interstate reach. Bode v. Barrett, supra.
[6] The complaints do not allege willful violation of the Act. 29 U.S.C. § 255 now provides a three year limit for willful violations, as well as the two year limit for other violations.
[7] The Secretary claims the disposition of the plates comes within the language "or other disposition" in the definition of sale, in 29 U.S.C. § 203(k). He relies on Shultz v. Falk, 439 F.2d 340 (4th Cir. 1971), cert. denied, 404 U.S. 827, 92 S.Ct. 62, 30 L.Ed.2d 56 (1971), for the proposition that the rental of property by an agent is a sale, and that volume of sales is measured by the gross receipts. The Court noted that Congress was not concerned with an enterprise's income or profit in fixing dollar volume tests, but with its size and impact on commerce. It may or may not be material that in this case the total money collected is not under the control of the license agency because it is daily deposited in the State Treasurer's bank accountthe commissions being paid at the end of each month. However, the Court does not decide that issue because the case is disposed of on other grounds.
[8] The tax here is a compensatory tax for the use of the State highways. N.C.G.S. § 20-97, Pilot Freight Carriers, Inc. v. Scheidt, 263 N.C. 737, 140 S.E.2d 383 (1965). A tax on a privilege is an excise tax. See Schenley Distillers v. United States, 153 F.Supp. 898, 904 (W.D.Pa. 1957), aff'd, 255 F.2d 334 (3rd Cir. 1958), cert. denied, 358 U.S. 835, 79 S.Ct. 57, 3 L.Ed.2d 72 (1958), for definitions of an excise tax. While it may be doubtful that Congress contemplated the situation in this case when it put in the excise tax exclusion, it does appear that the tax here meets the literal language of the exclusion provisions of the statute.
[9] The Court finds additional support for this position in Hodgson v. Centralized Services, Inc., 457 F.2d 824 (4th Cir. 1972). There the defendant prepared federal and state tax returns for individuals. The federal returns were sent out-of-state, either by the customer or the defendant. The Court expressed serious doubt that the defendant engaged in commerce. However, it disposed of the case by holding that the defendant came within the Act's exemption for local retail and service establishments, 29 U.S.C. § 213(a)(2). The defendants here, however, did not raise that issue.